**MOSTYN v. DELAWARE, L. & W. R. CO.**
**et al.**
**No. 209, Docket 20512.**

Circuit Court of Appeals, Second Circuit.
May 9, 1947.

SWAN, Circuit Judge, dissenting in part.

Tracy H. Ferguson, Bond, Schoeneck & King, and William F. Fitzpatrick, all of Syracuse, N. Y., for S. H. Golden Co., Inc.

Gustav P. Blaustein and Mackenzie, Smith & Michell, all of Syracuse, N. Y., for D. L. & W. R. Co.

Oscar J. Brown, and Mandel Weisberg, both of Syracuse, N. Y., for appellee.

Before L. HAND, SWAN and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The defendants appeal from a judgment entered on a verdict for the plaintiff in an action brought under the Federal Employers' Liability Act,[1] for personal injuries from being run over by a train of the railroad company. Mostyn sued the railroad, which impleaded the Golden Company under a contract of indemnity, alleging that that company was primarily liable. On this appeal the railroad argues that Mostyn was not in its employ at the time; that if he was, in any event he was not acting within the scope of his employment; and that he failed to show that the railroad was negligent in the management of the locomotive which ran over him. The Golden Company on its own behalf raises the same objections as the railroad to Mostyn's recovery, and in addition alleges that, if the railroad was liable, its contract of indemnity did not cover the liability. The evidence was in outline as follows. Mostyn was one of a gang of casual track-workers employed by the railroad in track repairs in the neighborhood of Sherburne, New York, near Syracuse. While in the railroad's employ the Golden Company housed and fed the men at Sherburne in "bunk cars" (disused railway cars fitted up with bunks for their accommodation and standing upon an unused track). The track on which the "bunk cars" stood ran north and south, and to the west of it was another track, not ordinarily used, which the workmen had to cross to enter or to leave the "bunk cars." Mostyn had worked for the railroad at Sherburne for eight or nine days in June, 1944. He then left and went to work for another road at Buffalo, but came back to Sherburne some time in July. The 10th of Au- gust was a Thursday, and he finished work at about 3:30, receiving a pay-cheque for a fortnight's wages. He had been sleeping and eating in the "bunk cars," and presumably he slept in them or close outside on Thursday night. On Friday morning he did no work; but after washing his clothes, he went in town on errands of his own and did not come back until evening. He took his supper in a "bunk car," but as he had found the bunk in which he slept so verminous that it was impossible to sleep and as the night was hot, he took his blankets and lay down to sleep parallel with the west rail of the track we have just mentioned, about three or four feet away. At about one o'clock on Saturday morning it became necessary to pull out some refrigerator cars that lay on this track just north of the "bunk cars," and to do so a locomotive with its tender backed north along it to couple with them. At the time when it had reached the spot where Mostyn lay, there were two men upon the locomotive proper and two upon the rear of the tender. One of the last was standing upon a "stirrup" on the west side of the tender carrying a lantern; the other was above him on a ladder which ran to the top of the tender. An electric bulb of 150 watts at the rear of the tender illuminated the track for about 800 feet ahead except the first thirty feet just in front of the tender. The engineer was looking backward down the track on the west side of the locomotive which was moving at about two miles an hour without ringing any bell. In some unexplained way Mostyn's right foot was cut off by the wheels of the tender or the locomotive; a possible explanation is that he woke up as the tender was passing, turned on his left side and put his right leg over the rail. There was some confirmation for this explanation in the testimony of some witnesses that no blood was found on the first seven wheels of the tender and locomotive. The judge left it to the jury to say whether he was employed in interstate commerce at the time, whether the operation of the locomotive was negligent, and how far he was guilty of contributory negligence. As to the Golden Company he left it to them to say whether its failure to keep the bunks

---

[1] § 51, Title 45 U.S.C.A.

in the "bunk cars" free from vermin was a contributing cause to the injury. Upon this appeal neither defendant presses any exception taken to the charge, or any question of evidence.

■ The question whether Mostyn was "employed" within the meaning of the statute[1] divides itself into two parts: whether he had ended his engagement on Thursday night or on Friday morning, and had not resumed it before he was hurt; and, if he had not, whether he was "employed" at all while he was asleep beside the track. The defendants argue that when he did no work on Friday and went to the village, he quit the job as he had in June, and that his return to the "bunk cars" on Friday night was not a re-entry upon it. No doubt it was possible for the jury so to construe his conduct on Friday, but it was not necessary that they should, for the uncontradicted testimony of a fellow employee, Wood, was that when an employee meant to quit he went to Syracuse to get his last pay. It was possible to construe the arrangement to be that these casual workers were free to work or to take a day off at their pleasure, but that they were not to be understood to have quit the job merely because they did the second. If so, although Mostyn was not "employed" on Friday while he was in town, when he came back that night to sleep he was as much and as little "employed," as he would have been had he been working during the day.

■ A more difficult question is as to when a man, continuously employed in interstate commerce, shall be deemed to be within the statute, though at the time when he is hurt he is not at work. It was possible, and perhaps more reasonable, to read the section simply to mean that so long as he was employed by an interstate railroad, he was protected wherever he may be. That would mean that if the railroad negli-

gently injured him at home—a most unlikely possibility to be sure—he might invoke the statute. The difficulty arose, however, from the fact that before the amendment of 1939, the courts had ruled that he must be directly engaged in interstate commerce at the time he was hurt: this was the device by which the supposed chasm of unconstitutionality was bridged. Even so, it was necessary to define when a man became directly engaged in interstate commerce, though all his work was interstate while he was engaged in it. Was he so employed while he was going to his work and coming away? It was held that he was,[2] but distinctions at once began to proliferate as to that, for he might stop on his way, or choose a route dictated for his own purposes.[3] Or again he might interrupt the continuity of his work for a purpose not directly connected with it.[4] It would be too optimistic to say that the decisions can all be reconciled. We hold, as we did in Young v. New York, N. H. & H. R. Co., supra, that any activity undertaken by an employee for a private purpose is certainly not within his employment. That, however, does not answer the difficulties, for the really important question is of activities which, though literally not part of the work, are necessary to its performance. Going to and coming from the job certainly are part of the work. What of eating and sleeping? These are certainly essential to its performance; yet, if they are included, are we to say that an employee is "employed" who is injured while at home, as we suggested a moment ago?

■■ Amid such casuistical dilemmas it is best not to attempt comprehensive solutions, but to proceed step by step. It seems to us that when a railroad provides shelter or food or both for its employees, and they are using the accommodations so provided to prepare themselves for their work, or to rest and recuperate, they must be regarded

[1] § 51, Title 45 U.S.C.A.

[2] Erie R. Co. v. Winfield, 244 U.S. 170, 37 S.Ct. 556, 61 L.Ed. 1057, Ann.Cas. 1918B, 662.

[3] Young v. New York, N. H. & H. R. Co., 2 Cir., 74 F.2d 251; Id., 2 Cir., 79 F.2d 844; Virginian Railway Co. v. Ear-

ly, 4 Cir., 130 F.2d 548; Sassaman v. Pennsylvania R. Co., 3 Cir., 144 F.2d 950.

[4] North Carolina Ry. Co. v. Zachary, 232 U.S. 248, 34 S.Ct. 305, 58 L.Ed. 591; Chicago, M., St. P. & P. R. Co. v. Kane, 9 Cir., 33 F.2d 866.

as in its "employ." Unless that is true we are driven back to including only the very work itself with the addition of going to or away from it. While the amendment does not help textually towards a solution, it does impressively disclose an overall purpose to extend the scope of the statute. We think that to implement this purpose we must go at least as far as the facts here before us; and we hold that, had Mostyn been sleeping in one of the "bunk cars," he would have been in the "employ" of the railroad. If so, the fact that he was driven out because the cars were unfit for sleeping, made it reasonably foreseeable that he would seek a substitute; and a jury might find a nearby bed on the earth such a substitute on a hot August night.

■ There was evidence to support a verdict against the railroad for negligence. It was proved that the men in the "bunk cars" constantly crossed the track, and had to do so, for, as we have said, their only exit was on that side. The infrequency of the track's use was an assurance of safety, and an added ground for caution on those occasions when it was used. It might have been possible to argue, although the likelihood that men might be crossing the track was ground for raising a duty towards them, Mostyn, who lay asleep beside the track was not within the class to which that duty was owed and could not take advantage of its breach, even though he would have escaped had the duty been performed.[5] However, Mostyn testified that two of his supervisors had suggested that the men should sleep outside; and hence the duty was not limited to those who were crossing the track. The jury was free to find—indeed could scarcely have avoided finding—that even the most casual lookout would have discovered Mostyn lying where he was; and his contributory negligence in doing so was of course not a defence.[6]

■ There remains only the question whether the contract between the railroad and the Golden Company covered a liability resulting from the fault of both. As we have said, the jury found that the verminous "bunk car" was a contributing cause to the accident, as was plainly the case; and the question thereupon becomes one for the court. The contract, being made in New York, is to be decided by the law of that state; and the substance of the undertaking of the Golden Company was as follows. It promised to keep the "bunk cars" in a "clean, neat, sightly and sanitary condition," and "to be fully and wholly responsible for any injury or damage to persons * * * including * * * employees, which * * * injury or damage * * * be in any way connected with the services to be performed * * * and to indemnify and save harmless the Railroad Company from * * * all * * * judgments * * * which may arise or result directly or indirectly from * * * or by reason of the failure of the contractor fully to keep, perform and fulfill each and every agreement and condition in this contract." Literally this language covers the situation at bar for it was "by reason of the failure" of the Golden Company to perform that the railroad company suffers the judgment; moreover such contracts presuppose that the indemnitee has been made liable and is therefore in some sense at fault. However, its fault may be one which involves no individual neglect of duty; but one which the law imputes to the indemnitee, as an agent's fault is imputed to his principal. It is possible to limit the promises to liabilities of that kind, or to those in which the indemnitee has been guilty of only "passive negligence," if that means something more. The Supreme Court has just left open the interpretation of a similar contract in American Stevedores v. Porello.[7] Some of the earlier cases in the New York Court of Appeals showed a disposition to construe such language as covering cases where the indemnitee was guilty of individual breach of duty;[8] but for over ten years and in a

---

[5] Restatement of Torts § 281(b) Comment c.

[6] § 53, Title 45 U.S.C.A.

[7] 329 U.S. —, 67 S.Ct. 847.

[8] Long Island R. Co. v. American Bridge Co., 175 App.Div. 170, 161 N.Y. S. 543, affirmed 225 N.Y. 692, 122 N.E. 886; Dudar v. Milef Realty Corp., 258 N.Y. 415, 180 N.E. 102; Turner Construction Co. v. Rockwood Sprinkler Company, 249 App.Div. 508, 293 N.Y.S. 551, affirmed 275 N.Y. 635, 11 N.E.2d 793.

series of decisions that court has now laid down what appears to us to be an unswerving canon that if the indemnitee means to throw the loss upon the indemnitor for a fault in which he himself individually shares, he must express that purpose beyond any peradventure of a doubt.[9] In some of the cases the distinction is made between the indemnitee's "passive" and "active" fault, and, as we have already intimated, we are not sure whether this means more than imputed fault; but it makes no difference here, for the railroad's fault was "active" on any theory. The doctrine at times has been traced back to Manhattan Railway v. Cornell,[10] but that was a case in which only the indemnitee appears to have been at fault at all, and where it would have been extremely verbal construction indeed, which should have made liable the indemnitor. In the case at bar more can be said for holding the Golden Company; and as a new question it is perhaps possible to come to the opposite conclusion. Be that as it may, New York decisions are authoritative for us.

Judgment against the railroad affirmed; judgment of the railroad against the Golden Company reversed; and cross-complaint dismissed.

SWAN, Circuit Judge (dissenting in part).

An interstate carrier's liability under the Federal Employers' Liability Act is to "any person suffering injury while he is employed by such carrier in such commerce." 45 U.S.C.A. § 51. The first question is whether Mostyn was so employed while asleep on railroad property during the night preceding a Saturday when he may have intended to go to work. Before the amendment of 1939, the authorities clearly indicate to my mind a negative answer. The amendment was intended to do away with the "moment of injury" rule so that an employee whose work has to do with both interstate and intrastate commerce shall not be deprived of the benefits of the Act because his work at the moment of injury was intrastate. It provides that an employee "any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce * * * shall * * * be considered as entitled to the benefits of this chapter." During the night hours normally devoted to sleep the employee owes no duties to his employer; nor do the hours spent in sleep "directly or closely and substantially, affect such commerce," even though he may work better after a night's rest. Hence I do not think the 1939 amendment should affect our decision. Mostyn was privileged to sleep in the bunk car (and a certain sum was deducted from his wages if he did so) but he was not required to sleep there; he could, if he wished, have rented a room in the nearby village as one of the track crew did. Therefore the question whether he was employed in interstate commerce during the night is no different than it would be had he been sleeping at a boarding house in the village or at his own home and suffered injury through the negligence of the railroad, as, for example, by reason of the destruction of the house by fire caused by a defective spark arrester in a railroad engine. In my opinion he was not injured while he was employed in interstate commerce. He was, however, an invitee on the railroad premises at night. I think the judgment should be reversed and the cause remanded for a new trial in order that the jury may pass upon his rights as such invitee. I concur in dismissal of the cross complaint.

[9] Petkinic v. Marc Eidlitz & Son, Inc., 1934, 266 N.Y. 437, 195 N.E. 143; Thompson-Starrett Co. v. Otis Elevator Co., 1936, 271 N.Y. 36, 2 N.E.2d 35; Thompson-Starrett Co. v. American Mutual Liability Insurance, 1937, 276 N.Y. 266, 11 N.E.2d 905; Employers' Liability Assurance Corp., Ltd., v. Post & McCord, Inc., 1941, 286 N.Y. 254, 36 N. E.2d 135; Walters v. Rao Electrical Equipment Co., 1942, 289 N.Y. 57, 43 N.E.2d 810; Schwartz v. Merola Bros. Construction Co., 1943, 290 N.Y. 145, 48 N.E.2d 299; Semanchuck v. Fifth Ave. & 37th St. Corp., 1943, 290 N.Y. 412, 49 N.E.2d 507.

[10] 54 Hun 292, 7 N.Y.S. 557, affirmed 130 N.Y. 637, 29 N.E. 151.