MORRIS v. PENNSYLVANIA R. Co.

No. 159, Docket 21885.

United States Court of Appeals
Second Circuit.

Argued Jan. 9, 1951.

Decided March 14, 1951.

Chase, Circuit Judge, dissented.

Edward F. Butler, of New York City (Conboy, Hewitt, O'Brien & Boardman, of New York City, on the brief), for defendant-appellant.

B. Nathaniel Richter, of Philadelphia, Pa. (Leo Gitlin, of New York City, and Richter, Lord & Farage, of Philadelphia, Pa., on the brief), for plaintiff-appellee.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiff Etta Morris is the widow of Stephney Morris, an employee of defendant Pennsylvania Railroad Company who on April 7, 1948, was struck and killed on his way to work in the defendant's freight transfer yard in western Philadelphia. In this action brought to the District Court below she has recovered a verdict and judgment of $34,560 under the Federal Employers' Liability Act, 45 U.S.

C.A. § 51 et seq., and the railroad has appealed. The principal issues turn upon the questions whether Morris was in the course of his employment at the time of the accident causing his death and whether the railroad was guilty of negligence. The issue of contributory negligence was covered by the jury, which by special interrogatories found that the present monetary value of the loss sustained by the widow and children of the decedent Morris was $57,600, but that the decedent's negligence contributed to the result to the extent of 40 per cent, thus reducing the figures to the amount of the verdict rendered. The railroad, however, holds all recovery barred because Morris came into the yard by an entrance it says he should not have used.

Ordinarily Morris worked for the railroad in the Transfer Station, an island entirely surrounded by tracks in the northeastern part of the yard. The yard, which is above the street level, with various intersecting streets passing underneath, is roughly oval in shape with massed switches at each end. These connect the many parallel tracks with several through tracks running northwest to southeast and bounding the yard on the southwestern side. Two things particularly are done in the yard: "classification" and freight transfer. Classification is a car-shuffling process in which incoming trains are broken up and reformed into different out-going trains. Cars to be classified are pushed one by one from the northwest to a high spot called the "hump," whence by force of gravity they roll southeast under one-man handbrake control through switches and crossovers to the proper track. The classification tracks are in the southwestern part of the yard. To the northeast are tracks accommodating cars to and from which freight is to be transferred at the Transfer Station. These cars are pushed to and from the Station by switch engines.

The function of the freight transfer itself is to handle freight in less than carload lots. The Station consists of freight loading platforms under a shelter shed and adjacent tracks where cars are spotted for loading and unloading. When decedent was working he manned one of the platform trucks used in handling the freight. On this day he was due to report for work at 3:30 p. m. At about 2:45 he was observed "staggering" toward a car being classified from the hump as described above, and it hit and killed him. It seems agreed that he had been struck by another car passing earlier; but no negligence was claimed as to that, and the jury has specifically found—without appeal by the plaintiff—that there was no negligence upon the part of the brakeman McElrath who manned the car which killed him. The jury did, however, find negligence in defendant's failure to provide a safe place of work, and supplemented this by a finding that there was no means of access to the Philadelphia Transfer Yard which was reasonably safe.

There appear to be several entrances properly so called to the yard, and a large number of other points at which access is physically possible. Morris entered by some stairs rising from 52d Street. This entrance is several hundred feet southeast of the hump, and on the southwest side of the through tracks and those carrying the hump traffic. There was evidence that this entrance was forbidden to all employees except those engaged in the humping operation who did not have to cross the tracks there to report for work at the hump itself. Notices forbidding passage were posted there and renewed from time to time as they became defaced or illegible. Nevertheless, as the jury found, this entrance was used by the employees, as the railroad knew. It is the railroad's insistence that Morris should have used an alternative entrance, particularly that at 44th Street, at the southeastern end of the yard. This was a way used by autos going to the Transfer Station. It, too, required the crossing at grade of some eleven through tracks bunched together, as well as some further local tracks. It was thus necessary to pass over various railroad tracks whatever entrance was used. There was some evidence by plaintiff of an earlier existing overhead way at one entrance, of union demands for the men for its restoration or a like erection at the

44th Street entrance, and of a railroad blueprint, indicating a possible intent to build such a way at this entrance; at the time, however, there was no such way available. Up to the time of the accident, the railroad notices specified some four entrances permitted, though, after the accident, it limited permission to the 44th Street entrance only, and brought this notice home to each employee by requiring his written acknowledgment.

While both parties sought directed verdicts, the court submitted the case to the jury under a charge which required them to answer eleven questions propounded to them in accordance with Fed. Rules Civ. Proc. rule 49(b), 28 U.S.C.A. It does not appear upon whose initiative this was done; it does appear that the course was accepted by all, and the form of the questions agreed on—after apparently considerable discussion and negotiation—except for the detail as to the tenth question hereinafter noted. These questions and answers are set forth verbatim in an appendix to this opinion. Here we shall stress the answers to questions 1 and 2 and 7 through 11. These place Morris in the course of his employment at the time of the accident, hold his death the proximate result, in whole or part, of the railroad's negligence in failing to provide a safe place to work, find that he was using a means of access prohibited to his knowledge, but one as to which there existed a well-known practice, known to the railroad, of use by transfer employees for access, and, finally, state that there was no means of access to the Transfer which was reasonably safe. Some mention is made of the fact that the original answer to the last question was "Yes," but was crossed out for the answer "No," initialled by all the jurors; this change, however, only goes to underline the careful discrimination which the jury's answers as a whole suggest.

The railroad makes as its first major contention that because Morris entered at an unauthorized place he was not then in the course of his employment and hence was not "suffering injury while he is employed by such carrier," within the terms of the Act, 45 U.S.C.A. § 51. It therefore contends that the court erred in refusing to set aside the verdict in view of the finding that the decedent was on his way to work by a forbidden route. It claims error in the charge with reference to question 1, which the jury answered by finding decedent in the course of his employment at the time. And conceding that it could have been held for negligence on a permitted way, or one used with its acquiescence, it holds that the interrogatories which did not go to the extent of inquiring whether it had acquiesced in the use of the 52d Street entrance by its employees were an inadequate basis for finding liability. And, as it points out, it asked for a change of question 10 to cover this point, just before the court's charge and after summation by counsel, a request which the judge refused, apparently because of its lateness and the fact that the form of the questions had already been agreed upon.

Ultimately and on this appeal the defendant came to stress the findings that the way was prohibited and that Morris knew of this prohibition as controlling the rest and disposing of the case. Thus its position is one dependent upon a discovery of inconsistencies among the answers to the interrogatories or between these answers and the ultimate verdict. It is not the business of appellate courts laboriously to seek out and capitalize on inconsistencies in jury verdicts or between answers sought at the parties' wish or by their consent in the exercise of the discretionary power given the judge by the rule. As both the provisions for special verdicts and for interrogatories accompanying a general verdict demonstrate, reconciliation of the jury's various responses should be sought, and accepted wherever possible, to achieve a harmonious result. F.R. 49(a), last sentence; F.R. 49(b), last two sentences. Bolan v. Lehigh Valley R. Co., 2 Cir., 167 F.2d 934, 936, 937; Bass v. Dehner, 10 Cir., 103 F.2d 28, 34, certiorari denied 308 U.S. 580, 60 S.Ct. 100, 84 L.Ed. 486; Hinshaw v. New England Mut. Life Ins. Co., 8 Cir., 104 F.2d 45, certiorari denied 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 48; Wayne v. New York Life Ins. Co., 8 Cir., 132 F.2d 28, 37; 3 Moore's Federal

Practice §§ 49.02, 49.03, 1st Ed. and 1949 Supp.; Ilsen and Hone, 21 Minn.L.Rev. 1; Lipscomb, 25 Wash. U.L.Q. 185. But we should observe that this often-desirable practice should be resorted to with discrimination and foresight; it should never be used for mere cross-examination of the jury to create error for the record. Its purpose and best achievement is to enable errors already potential because of confusions of fact or law "to be localized so that the sound portions of the verdict may be saved." Sunderland, Verdicts, General and Special, 29 Yale L.J. 253, 259; 34 Ill.L.Rev. 96. It is hence best available, when, as the judge can foresee, the issues can be thus clearly and simply differentiated, to save on appeal at least that portion which cannot be questioned; it is of more doubtful value in a relatively simple factual situation such as this where the details asked for may not be the whole story. It must be recalled that the jury, unlike a trial judge rendering his decision, cannot add those further findings which may properly shore up the result. Nevertheless we think the answers here, when viewed in the light of the situation disclosed, do not betray a fatal inconsistency and do support the result.

■ To approach the case, as the defendant insists, in terms of whether Morris was within or without the course of his employment appears to be a purely formalistic way. It is now too late to argue that a worker is within his employment only when actually on the job; indeed, we have demonstrated this strikingly in our own decision in Mostyn v. Delaware, L. & W. R. Co., 2 Cir., 160 F.2d 15, 17, 18, certiorari denied 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355, allowing recovery to a worker driven from a bunk car because of verminous conditions and asleep on the ground along a side track when injured. See also Healy v. Pennsylvania R. Co., 3 Cir., 184 F.2d 209, 211, 212; Thompson v. Eargle, 4 Cir., 182 F.2d 717. And the railroad's brief so concedes: "It is, of course, recognized that the course of employment within the Federal Employers' Liability Act is not limited to the actual work done but includes passage across the employer's premises to and from the place of work where that is a necessary incident of the day's work. Erie R. Co. v. Winfield, 1916, 244 U.S. 170 [37 S.Ct. 556, 61 L.Ed. 1057]." Here, where the decedent was killed on the defendant's property only shortly before he was to report for work, there can be no doubt that he was in the course of his employment unless, as the railroad contends, recovery is barred because he entered the yard at the wrong point.

■ But he had to enter it somewhere. Here the finding was that the railroad had provided no reasonably safe means of access. If this finding is permitted by the evidence, it should support the recovery. Any other view justifies the plaintiff's forceful statement in her brief of the argument she puts into the defendant's mouth if this finding be accepted: "True it is that we did not provide him with any other safe way to get there, and concededly we were negligent in failing to provide him with a safe method of ingress. Indeed, the path he selected may have been the least dangerous. But if he is to be run down, we want him to be run down on *our* hazardous route, and not on a hazardous route of his own selection." We do not stop to recapitulate the various cases cited by the parties; in general they lacked this vital fact. With it we think this case is covered by the law as most recently stated by the Supreme Court in Wilkerson v. McCarthy, 336 U.S. 53, 61, 69 S.Ct. 413, 417, 93 L.Ed. 497: "Much of respondents' argument here is devoted to the proposition that the Federal Act does not make the railroad an absolute insurer against personal injury damages suffered by its employees. That proposition is correct, since the Act imposes liability only for negligent injuries. Cf. Coray v. Southern Pac. Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208. But the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances. And a jury should hold a master 'liable for injuries attributa-

ble to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances,' bearing in mind that 'the standard of care must be commensurate to the dangers of the business.' Tiller v. Atlantic C. L. R. Co., 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L.Ed. 610."

The crux of the case is therefore whether there was evidence adequate to support this finding. The railroad appears to assume that the 44th Street entrance, being a better way, was therefore one to which it could restrict its employees. But that does not of itself show that it was reasonably safe. True, it was a way in use by autos, whereas the 52d Street entrance, while obviously invited for use of the workers at the hump, required walking along the tracks to reach the Transfer Station. Actually there was evidence for the plaintiff, sharply contested, it is true, by defendant, in support of her contention that the way Morris chose was the shorter and even more convenient route for him.[1] The evidence, too, of its continued use known to the defendant, as shown by the testimony noted below of the latter's concededly ineffectual attempts at disciplining violators, was of relevance on the issue. But irrespective of all this, we do not see how we can say as a matter of law that the 44th Street route was safe and that no jury could justifiably find to the contrary. Using this route along with the autos to walk over the many tracks where, as appeared, the through trains could pass and repass at 15 miles per hour as compared to an average 4 miles generally in one direction of the cars on the classification tracks surely has elements of danger. True, there were warning signs at the crossings; but these were hardly enough to remove the peril.[2] We think the jury's answer to question 11 must therefore stand.

We find no error in the charge whereby these issues were submitted to the jury. The judge did not, as asserted, take the question whether decedent was in the course of his employment from the jury; a reading of the entire charge demonstrates the contrary. The only remaining issue is as to the court's refusal to rephrase question 10 to ask not merely whether the practice of entry by the forbidden gate was known to the railroad, but also whether it acquiesced in it. There may be some question as to the defendant's right to urge this issue in view of the late time of the request and the failure of defendant to object to its refusal; but affirmance may properly be put on broader grounds. All the facts are known; putting the label of acquiescence or non-acquiescence upon them adds only a legal conclusion. There is no doubt that defendant posted its notices, and made objections at safety meetings (though at the one meeting Morris had attended this matter was not discussed); and there was some general reference to disciplining violators, because the practice happened so often. What this discipline consisted of was not shown; the indication was that it involved some entry in the employee's work record, though nothing of the kind was shown as to Morris. Nothing more effectual to enforce the rule was ever suggested before the accident. The whole savors of an attempt to excuse legal liability, rather than determined accident prevention. Be that as it may, had the railroad actually provided a safe alternative this might have been adequate; under the circumstances we

1. On these points plaintiff makes an extended argument for the greater convenience of the 52d Street entrance based on the place where the trolley (used by employees to come to work) stopped on the street, the direction of vehicular travel there, the lesser number of railroad tracks to cover, the loud speaker system for warning, and the asserted lesser distance to travel from the trolley stops. These all concern matters strongly in dispute; we cite them not as facts, but to illustrate the jury nature of the question involved.

2. The warning signs were with respect to both crossing the tracks at this point and the rate of speed—15 miles per hour —set for the through line secondary freight tracks. There was also testimony by a conductor of a man stationed at the crossing—"If we shift up in the Transfer I have a man placed at that crossing"—which appears to relate to the local classification activity and not the through traffic.

think it cannot avoid liability, whatever the intent of its officers. At most the requested question could only probe that; that, under the circumstances, we consider irrelevant.

Judgment affirmed.

## Appendix

The following are the questions and answers as returned by the jury (with the Court's interspersed directions as to the order of answering omitted, as indicated by asterisks):

"1. Was the decedent Morris in the course of his employment at the time of the accident? *Yes * * ***

"2. Was the death of the decedent Morris the proximate result in whole or in part of the negligence of the defendant railroad either: (a) in that it did not provide a safe place to work; *Yes* or (b) in the manner of McElrath's operation of his car *No * * ***

"3. Was the death of the decedent Morris the proximate result either in whole or in part of his own contributory negligence? *Yes * * ***

"4. What is the present monetary value of the loss sustained by the widow and children of the decedent Morris within the rules given you, as the proximate result of the defendant railroad's negligence? *$57,600.00 * * ***

"5. What percent of the amount set forth in your answer to question No. 4 should be deducted because of the decedent Morris' contributory negligence? *40%.*

"The difference between the amount stated in question No. 4 and the amount stated in question No. 5 is your verdict. *$34,560.00 * * ***

"6. Was the decedent Morris on his way to work when he was struck? *Yes.*

"7. Were the transfer employees of the defendant railroad prohibited against using the 52nd Street stairs as a means of access to Philadelphia Transfer? *Yes * * ***

"8. Did the decedent Morris know, or should he have known, that the defendant railroad had prohibited the 52nd Street stairs as a means of access to the Philadelphia Transfer? *Yes.*

"9. Was there a well-known practice on the part of transfer employees of using the 52nd Street stairs as a means of access to the Transfer? *Yes * * ***

"10. Was this practice known to the defendant railroad, or should the defendant railroad have known of it? *Yes.*

"11. Was there any means of access to the Philadelphia Transfer which was reasonably safe? *No."*

FRANK, Circuit Judge (concurring).

I concur in the decision and in all that Judge Clark said, except that I disagree with the tenor of his general remarks about the value and purpose of special verdicts. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54, 70. I agree with Judge Learned Hand's suggestion in his concurring opinion in that case that "it would be desirable to take special verdicts more often." Judge Hand continued: "True, it would often expose the general verdict to defeat by showing how irrational had been the operation of the juror's minds. However, like my brother Frank, I am not among those who appear to esteem the system just because it gives rein to the passional element of our nature, however inevitably that may enter all our conclusions. I should like to subject a verdict, as narrowly as was practical, to a review which should make it in fact, what we very elaborately pretend that it should be: a decision based upon law." Sunderland's brilliant article,[1] which Judge Clark cites, does not, I think, support Judge Clark's rather grudging approval of such fact-verdicts.

In a very recent opinion, this court has expressed regret that, on one of the issues of fact, the judge did not request the jury's special finding.[2] I cannot go along with

1. Sunderland, Verdicts, General and Special, 29 Yale L.J. (1920) 253. Pertinent portions of that article are quoted in

Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54 at pages 60–61.

2. Person v. Cauldwell-Wingate Company Inc., 2 Cir., 1951, 187 F.2d 832.

Judge Clark's expression of doubt about the lack of value of a special verdict in the instant case or others like it. Several courts have recently said it was desirable to obtain such a verdict on issues no more simple than that involved here. In one such case, Pacific Greyhound Lines v. Zane, 9 Cir., 160 F.2d 731, the court said that Rule 49 was "designed to encourage and facilitate use of special verdict or in the alternative the general verdict accompanied by the jury's answers to interrogatories as to issues of fact." And see Phillips Petroleum v. Bynum, 5 Cir., 155 F.2d 196, 199. Indeed, Judge Magruder, speaking for the First Circuit Court of Appeals, has recognized the desirability of special verdicts in criminal cases. See Chandler v. U. S., 1 Cir., 171 F.2d 921, 942; Best v. U. S., 1 Cir., 184 F.2d 131, 137; Malatkofski v. U. S., 1 Cir., 179 F.2d 905, 918. See also Haupt v. U. S., 330 U.S. 631, 641, note 1, 67 S.Ct. 874, 91 L.Ed. 1145.

CHASE, Circuit Judge (dissenting).

The special verdict exonerated the brakeman on the car which struck the decedent. This left as the only possible ground for liability of the appellant under the Employers' Liability Act, 45 U.S.C.A. § 51 *et seq.*, the failure to provide a safe place for the decedent to work, *i. e.*, a safe way to go to work and to go away from work across the property of the railroad. Though the jury found that no such safe way was provided, that was not the proximate cause of the death. It was, on the contrary, caused by conditions at a place where the decedent was, and knew he was, prohibited from going. But the railroad was under no statutory liability for failing to make safe for the decedent a way to go to or from his place of work over that part of the railroad's property where the decedent was not only not required, but was not even permitted, to be. Philadelphia & R. Ry. Co. v. Thirouin, 3 Cir., 9 F.2d 856.

The special verdict does, indeed, show that the appellant knew, or should have known, of a practice of violating the above prohibition. But there was evidence that violators were disciplined for that and there was no finding that the railroad acquiesced in such violations; nor was that question left to the jury despite the railroad's effort to have it. It was, I think, plain error not to submit that question to the jury with the others. That error led to the next which was to treat the prohibition as impugned in the absence of anything to show, by way of special verdict or general submission of such questions in the charge, that the jury found that the appellant acquiesced in the violation of it or gave the decedent some reasonable ground for believing he need not observe it. See Restatement, Agency, Sec. 526, comment e; St. Louis Ry. Co. v. Stewart, 124 Ark. 437, 187 S.W. 920.

Moreover, as a contributing cause of this employee's death was his violation of a specific rule of the railroad which had been adopted for his own safety, it may be that the legal effect of that, as shown by Van Derveer v. Delaware L. & W. R. Co., 2 Cir., 84 F.2d 979, certiorari denied 299 U.S. 595, 57 S.Ct. 120, 81 L.Ed. 438, has survived the abolition of the defense of assumption of risk.

I would reverse and remand.