Rose POWERS, as Administratrix of the Goods, Chattels, and Credits of Edward J. Powers, Deceased, Plaintiff-Appellant,

v.

The NEW YORK CENTRAL RAILROAD COMPANY, Defendant-Appellee.

No. 97, Docket 24604.

United States Court of Appeals Second Circuit.

Argued Nov. 20, 1957.

Decided Jan. 15, 1958.

Motion to Amend Mandate Denied Feb. 13, 1958.

Irving Levine, New York City, for plaintiff-appellant.

C. Austin White, New York City (Gerald E. Dwyer, Robert Cedar and William R. Johnston, New York City, of counsel on the brief), for defendant-appellee.

Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

The two questions for decision are whether there was sufficient evidence to support the conclusion that Powers was in the course of his employment by the railroad at the time he was found in the Hudson River on March 10, 1949, immediately adjacent to his place of work, and whether the jury's answers to the special interrogatories may be considered as having determined that issue in favor of the plaintiff. As we answer both questions in the affirmative, and as there was ample evidence from which the jury could find that the railroad did not have at hand sufficient life-saving equipment and did not take adequate measures to preserve Powers' life, we reverse the order of the District Court which set aside the jury's verdict for $85,000 and remand the case to the District Court with directions to reinstate the verdict and enter judgment thereon.

The executrix of the estate of Edward Powers brought this suit under the Federal Employers' Liability Act, 45 U.S.C. A. § 51 et seq., alleging that Powers' death on March 10, 1949 resulted from the negligence of the defendant railroad because of its failure to have at hand equipment for life-saving and resuscitation when Powers was found floating in the Hudson River just off the defendant's bulkhead, and for failure to secure prompt and proper care for the preservation of his life after his removal from the river.

The only material disputes as to the occurrences surrounding Powers' drowning on March 10, 1949 concern the time when Powers was seen on dry land and the time when he was first discovered in the water.

For twelve years prior to March 10, 1949 Powers, then 42, had been employed by the New York Central as a crane operator. He was the only crane operator assigned to the railroad's 60th Street Freight Yards which extend from 59th to 72nd Streets along the Hudson River and include docks, piers and float bridges, among them Piers D, E, F and G. Powers was assigned to work between Piers D and F from 8:00 A.M. to 5:00 P.M. and, during the colder months such as March, he was allowed an extra 30 minutes to drain the radiator of his crane. Thus it is conceded that his quitting time on March 10, 1949 was 5:30 P.M.

On March 10 Powers' last assignment was to pick up some cases of machinery and place them on the bulkhead between Piers E and F and he finished that work about 3:30 P.M. Although it does not appear that Powers did anything after 3:30, he was required to remain in attendance until 5:00 P.M. in case he might be needed. Powers was next seen sometime between 5:00 and 6:00 in the Pier F office where he tried to make a telephone call. When the railroad policeman, Charles Vail, came to the office in response to a request to investigate, Powers identified himself as an employee. After this, Joseph Walker, a railroad checker who had been in the Pier F office during Vail's visit and earlier when Powers tried to call Pat's Bar & Grill, saw Powers walking south toward Pier

E.[1] Walker testified that this was shortly after 6:15 or 6:20.

Policeman Vail, who testified that his talk with Powers occurred around 5:45 or 5:50, later heard some splashing in the water around Pier G, saw Powers' body in the river, and ran over to Walker's gang for help. Walker found a boat hook with which he grabbed Powers' pea jacket and held Powers' head out of the water. No one knew how Powers had got into the river, nor does the record show whether he could swim.

Meanwhile Alfred Schoen, the clerk on Pier G, when he saw Powers in the water, which he said was about 5:40, went out on Pier F and signalled for assistance to the captain of New York Central tug 12 which was off the end of the pier heading south. The tug put about and came in to the bulkhead and two deckhands, Vincent Hilyer and Thomas Pehush, climbed down below the bulkhead, put a rope around Powers and after ten minutes they succeeded in pulling him up onto the bulkhead. Pehush testified that the tug went to Powers' assistance at about 5:50; Hilyer said it was between 5:00 and 5:30.

Hilyer and Pehush then stretched Powers out on the bulkhead and alternated in applying artificial respiration. After fifty minutes' manipulation Powers started to breathe again. No blankets were available, the air temperature was 44 degrees and the water temperature 40 degrees. No stretcher being at hand, Hilyer and Pehush then carried Powers to a nearby unheated restroom, used by Powers and other employees to change their clothes, laid him on a table and cut off his clothes. They put burlap sacks all around his body and massaged him although at this point Powers resisted and tried to fight them off.

Meanwhile policeman Vail had telephoned his superior, Lieutenant Jenks, who in turn called for an ambulance and for the Harbor Squad of the Police Department whose headquarters was at the Battery about five miles away. The Emergency Service Division of the New York City Police Department which was nearby and fully equipped for such life-saving was never contacted.

A few minutes after Powers had been carried to the restroom, a private ambulance arrived, Powers was taken away on a stretcher and was admitted to nearby Roosevelt Hospital at 7:23 P.M. He died at 9:30 P.M. The Medical Examiner's report stated that death was due to submersion, pulmonary edema and acute alcoholism.

Judge Murphy charged the jury that their verdict turned on two simple factual issues: "Whether the defendant railroad by its failure to have certain equipment for rescuing and resuscitating a drowned man was negligent, and, two, if you find that such failure made it negligent, whether such negligence was the proximate cause in a period of three or four hours of the drowned man's death." Although it was apparent that the railroad contended then, as it did later, that it was not liable because Powers' accident had not occurred in the course of his employment by the railroad, this question was not put to the jury. See Morris v. Pennsylvania R. Co., 2 Cir., 1951, 187 F.2d 837, 843. The judge merely stated that it was conceded that Powers had half an hour after 5:00 P.M. in which to drain his crane and a reasonable time to leave the grounds of the railroad. But instead of asking the jury to decide whether the railroad owed Powers some duty by reason of his still being in the course of his employment at the time and place of his misadventure, the court

1. There is no evidence in the record to show whether in going south toward Pier E Powers was proceeding toward the exit. There is no evidence to show how extensive the railroad property is, how far the available exits were from Powers' place of work, or how long it would take to reach any one or more of such exits. Nor was there any evidence of any railroad regulation about the time within which and the means by which employees were to leave the 60th Street Freight Yards after finishing their work.

merely asked the jury to fix the time when Powers was last seen on dry land and the time when he was first seen in the water. The plaintiff's requests to charge 1, 2, 3, 4 and 8 had to do with these matters, and exceptions to the judge's failure to cover these matters in his charge were duly noted in the record.

The judge left to the jury eight special questions which the jury answered as follows:

"Question 1. At what time on March 10, 1949, before Powers was in the water, was he last seen on dry land?

"Answer: About 5:15 to 5:40.

"Question 2. At what time on March 10, 1949 was the body of Mr. Powers first seen in the water?

"Answer: About 5:45 to 6:15 P. M.

"Question 3. What was the proximate cause of Mr. Powers' death?

"Answer: Submersion, pulmonary edema, failure to conserve body heat, failure to summon New York City Police Emergency Squad, failure of railroad to maintain trained life saving and first-aid personnel and not having first-aid station.[2]

"Question 4. Did the absences or failures mentioned in Question 3 create an unreasonable risk of harm to persons like the plaintiff?

"Answer: Yes.

"Question 5. If your answer to Question 4 is yes, was such risk of harm reasonably foreseeable by the defendant?

"Answer: Yes.

"Question 6. Was the defendant railroad negligent under the circumstances of the case in failing to have blankets, inhalator, pulmotor, stretcher, life-saving equipment, or to provide a heated room to which Mr. Powers could be removed?

"Answer: Yes.

"Question 7. Is your verdict for the plaintiff or the defendant?

"Answer: Plaintiff.

"Question 8. If your verdict is for the plaintiff, what is the amount of plaintiff's damages?

"Answer: $85,000."

There was ample evidence in the record to support each and every one of the answers of the jury.

Judge Murphy set aside the verdict and directed judgment for the railroad in an opinion reported at 149 F.Supp. 71, giving two reasons for his action: (1) That under the jury's time findings Powers was not an "employee" at the time of the accident, and (2) that, in any event, the railroad was under no duty to provide medical treatment. We do not agree with the District Judge's interpretation of the jury's finding and his view of the facts, and also with his views of the duty of the railroad under the circumstances as found by the jury in their answers to the special questions.

Whether Powers was acting within the scope of his employment at the time of the accident which led to his submersion in the Hudson River was a question to be resolved by the jury from all the surrounding circumstances. When, where and how the accident occurred were circumstances to be determined and weighed by the jury in order to determine this central question.

■■ An employee does not lose his character as an employee at the very moment his working time ends. Mostyn v. Delaware, L. & W. Co., 2 Cir., 160 F. 2d 15, certiorari denied 1947, 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355. An employee still on the employer's property who is leaving work within a reasonable time after the work day is over is certainly within the protection of the Federal Employers' Liability Act, 45 U.S.C.

---

**2.** The judge listed eight other possible proximate causes of Powers' death which were not checked by the jury: Acute alcoholism, absence of inhalator, absence of stretcher, absence of pulmotor, absence of life-saving equipment, absence of doctor, failure to effect a more prompt rescue, and failure to administer drugs.

A. § 51 et seq.; Erie Railroad Co. v. Winfield, 1917, 244 U.S. 170, 37 S.Ct. 556, 61 L.Ed. 1057; Morris v. Pennsylvania R. Co., 2 Cir., 1951, 187 F.2d 837, 841, where the deceased was injured on the railroad's property 45 minutes prior to when he was due to report for work.

It is conceded that Powers' work did not finish until 5:30 because of the half hour allowed for draining his crane in cold weather. The place where he was discovered in the water was only a short distance from the shack where he changed his clothes and from the office where he stopped in to make a telephone call; it was also near where Joseph Walker last saw him walking toward Pier E. The testimony as to the time when he was found in the water ranges all the way from sometime between 5:00 and 5:30 until about 6:40 P.M. Thus there was ample evidence to support the jury's answer to Question 1 that Powers was last seen on dry land about 5:15 to 5:40 P.M. and its answer to Question 2 that his body was first seen in the water about 5:45 to 6:14 P.M. From these findings, and from the likelihood that Powers was in the course of leaving the railroad's premises after having finished the day's work, it follows that there is no support for the District Judge's conclusion that Powers was not an employee at the time of the accident.

The District Court observed, in the course of its holding that Powers was not an "employee" at the time, that the Hudson River was not a part of the defendant's premises. The place where Powers was found was alongside the bulkhead between Piers F and G. These piers are about 500 feet long. Obviously these waters of the Hudson River would be used only by the railroad which operated both piers which enclosed these waters or by those doing business with the railroad. We do not agree with the argument of the District Judge that it is just as if Powers' body had been found on the public highway adjoining the defendant's property on the east. If Powers was in the course of his employment at the time he was still on the bulkhead, it would be absurd to hold that both literally and figuratively he fell out of his employment and lost the protection of the Act because he was precipitated off his employer's property into the adjacent navigable waters where his employer did not have title to the land lying beneath the waters. Curiously enough this question was not referred to by the judge in his charge and so far as the record shows, no such claim was made by the defendant until after the verdict.

As there was abundant evidence to support the conclusion that Powers was within the protection of the Federal Employers' Liability Act at the time of the accident, the remaining questions were the two which the court stated to the jury, as referred to above, namely, whether the railroad's failure to have certain rescue and resuscitation equipment constituted negligence and whether, if the jury found such negligence, that negligence was the proximate cause of Powers' death. In its answers to special questions 3 and 6 the jury decided these issues in favor of the plaintiff. In Answer 6 they found the railroad negligent for failing to have blankets, inhalator, pulmotor, stretcher, life-saving equipment and failing to provide a heated room to which Powers could be removed. In Answer 3 they found other failures on the part of the railroad which were the proximate cause of Powers' death, namely, failure to conserve his body heat, failure to summon the New York City Police Emergency Squad (which could have brought all the necessary life-saving equipment to the scene in a few minutes) and failure to maintain trained life-saving and first-aid personnel and not having a first-aid station. Lanni v. Wyer, 2 Cir., 1955, 219 F.2d 701, cited by the District Judge in support of his conclusion that there was no duty to treat, is not in point as it did not have to do with emergency first aid for injuries on the railroad's premises, but had to do with care during hospitalization elsewhere.

The District Judge also denied a motion to set aside the verdict on the ground that it was excessive. It is clear

that a verdict for $85,000 in favor of his widow, then 47, and three children who were then minors, to compensate them for the death of plaintiff's husband and the father of their children, then 42 and earning $4,200 per year, was not excessive.

On this record it seems to be clearly established that the jury by their general verdict and their answers to the special questions have decided in favor of the plaintiff all the factors necessary to sustain the verdict. We would be loathe to require a retrial of a cause of action which arose almost nine years ago and with regard to which a number of witnesses have already died. In any event, for the reasons which we have enumerated, we believe that a new trial, in order to require another jury to answer by general verdict or special answers the questions in the form in which the District Judge should have propounded them, under a charge which would make it clear that the jury's verdict must turn on whether Powers was an employee at the time of the accident, is not required.

The judgment of the District Court is reversed and the case remanded for reinstatement of the verdict and entry of judgment for the plaintiff.

On Motion to Amend Mandate

PER CURIAM.

On January 15, 1958 we decided that the trial judge had improperly entered judgment n. o. v. for the defendant and we ordered the verdict reinstated. Before our mandate issued plaintiff moved that the mandate be amended so as to include interest from the date of the verdict or the entry of the erroneous judgment below.

Briggs v. Pennsylvania R. Co., 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403, expressly left open the question now before us. 334 U.S. at page 307, 68 S.Ct. at page 1040.

■ Title 28 U.S.C.A. § 1961 is controlling. It provides that interest on any money judgment "shall be calculated from the date of the entry of the judgment * * *." The Fifth Circuit has

read that section as permitting the allowance of interest from a date earlier than the entry of judgment on the mandate of the court of appeals. Louisiana & Arkansas Ry. Co. v. Pratt, 5 Cir., 142 F.2d 847, 153 A.L.R. 851 (from date of verdict); Givens v. Missouri-Kansas-Texas R. Co. of Texas, 5 Cir., 196 F.2d 905 (from date of erroneous judgment); Wright v. Paramount-Richards Theatres, 5 Cir., 198 F.2d 303 (from a date between verdict and entry of erroneous judgment). See 64 Yale Law J. 1019 at 1035 (1955).

However, in this circuit the law is otherwise. Chemical Bank & Trust Co. v. Prudence-Bonds Corp., 2 Cir., 213 F.2d 443, certiorari denied 348 U.S. 856, 75 S.Ct. 80, 99 L.Ed. 674. That case, though arising in a very different factual and legal background, is legally indistinguishable on the point before us. This court, there, held that the damages awarded in the judgment below should be increased. But it denied a request for nunc pro tunc entry of judgment and ruled that interest on the increase should be calculated from the date of entry of the judgment on mandate. It said: "The delay in the entry of the proper judgment was necessary in the sense that time for appellate reviews was required." 213 F.2d at page 445. The same observation is pertinent here.

Motion denied.

LUMBARD, Circuit Judge (dissenting).

I think that a fair interpretation of our power under the statute, and the interests of justice require that interest be paid in this case from the date that a correct judgment for the plaintiff should have been entered. The majority opinion, however, has taken Chemical Bank & Trust Co. v. Prudence-Bonds Corp., 2 Cir., 1954, 213 F.2d 443 and erected it into an ironbound, inequitable and illogical rule.

The Chemical Bank case "involved an accounting by the Bank as * * * trustee under a trust agreement securing * * * bonds issued by the debtor corporation. Objections to the account were

filed, some of which were sustained and others rejected by the District Court. * * * Both the Bank and the Objectors appealed. On the Bank's appeal we affirmed; on the Objectors' we reversed, with directions to increase the surcharge by $902,750. * * * " 213 F.2d 443, at page 444. Interest was specifically ordered to be 3% per annum. The mandate of this court was issued and a district court decree entered thereon. The decree provided for interest on this additional surcharge as of the date of the original district court decree, viz. December 19, 1952. On appeal from the entry of this decree this court noted that "We did not direct entry of judgment as of December 19, 1952" and remanded for computation of interest as of the date of the entry of the decree on mandate.

Nowhere did the court deny that it had the power to enter a mandate directing that interest be paid as of the original decree. "The delay in the entry of the proper judgment," it was said "was necessary in the sense that time for appellate reviews was required." 213 F.2d 443, at page 445. But these processes were called forth by both parties and any delay was attributable to both.

The present case is a far cry from such a situation, and I believe we should direct the judgment *nunc pro tunc*.

First, any delay in these proceedings was caused by the erroneous decision of the District Court. Secondly, since we are reinstating the jury verdict in this case as of the date that verdict was returned, it cannot be disputed that the amount due the plaintiff was liquidated.

It is provided by the rules that entry of judgment on the verdict of a jury should be made "forthwith." Rule 58 Federal Rules of Civil Procedure, 28 U.S.C.A. When a jury makes an award of damages in a personal injury or death case the award includes any damages caused by the delay between the incident of injury and the trial. 64 Yale Law J. 1019 (1955). That this award bears interest from the date of judgment merely provides for any damage caused by further delay.

In the instant case Powers' death occurred more than nine years ago. The verdict of the jury was returned November 21, 1956. Judgment should have been entered on that verdict "forthwith." And interest should run from that date or at least the date of the erroneous judgment. The Fifth Circuit has seen fit to follow this equitable procedure. See Louisiana & Arkansas Ry. Co. v. Pratt, 5 Cir., 1944, 142 F.2d 847, 153 A.L.R. 851; Givens v. Missouri-Kansas-Texas R. Co. of Texas, 5 Cir., 1952, 196 F.2d 905; Wright v. Paramount-Richards Theatres, 5 Cir., 1952, 198 F.2d 303. I see no reason for denying the relief to which the plaintiff is justly entitled.

I dissent.