649 F.2d 1004
 Sandra G. MOORE, Plaintiff,
v.
The CHESAPEAKE & OHIO RAILWAY COMPANY, a corporation, Appellee,
v.
ROLLYSON'S CATERING SERVICE, INC., a corporation, Appellant.
Sandra G. MOORE, Appellee,
v.
The CHESAPEAKE AND OHIO RAILWAY COMPANY, a corporation, Appellant,
v.
ROLLYSON'S CATERING SERVICE, INC., a corporation, Defendant.
 Nos. 80-1586, 80-1587.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1981.
Decided May 29, 1981.
 
 Norman Fenstermaker, Huntington, W.Va. (Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, W.Va., on brief), for appellant in No. 1586.
 Fred Adkins, Huntington, W.Va. (Donald G. Powers, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., on brief), for appellee in No. 80-1586.
 Norman Fenstermaker and Fred Adkins, Huntington, W.Va. (Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Donald G. Powers, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., on brief), for appellant in No. 1587.
 Charles Collins, Roseville, Minn. (Donald L. Rudquist, Deparcq, Anderson, Perl, Hunegs & Rudquist, Minneapolis, Minn., Lawrence J. Lewis, Vinson, Meeker, Lewis, Peoples & Pettit, Huntington, W.Va., on brief), for appellee in No. 80-1587.
 Before BUTZNER, PHILLIPS and MURNAGHAN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Sandra G. Moore, a mail clerk employed by the Chesapeake and Ohio Railway Co. at its Huntington, West Virginia headquarters, was injured while eating lunch in a cafeteria located in the headquarters building and operated by Rollyson's Catering Service, Inc. The injury occurred when Moore slipped on a pat of butter as she carried her tray from the serving line to a condiment table. Although Moore did not fall, she twisted her back and spine to the extent that she required surgery and suffered permanent restrictions of mobility.
 
 
 2
 Moore brought suit against the C&O under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., seeking $300,000 damages for past and future medical expenses, loss of future earning capacity, and pain and suffering. The suit alleged that the C&O breached its duty under the FELA to provide a reasonably safe place to work. The suit proceeded on two theories: first, the C&O failed adequately to supervise operation of the cafeteria by Rollyson's, specifically failing to provide and enforce adequate rules and safety standards; second, Rollyson's failed to maintain the cafeteria in a safe condition, for which the C&O was liable as the employer or principal of Rollyson's.
 
 
 3
 The C&O filed a third-party complaint against Rollyson's, alleging that the written agreement between the C&O and Rollyson's for operation of the cafeteria required Rollyson's to indemnify the C&O for any damages awarded to Moore, and attorneys' fees. At trial, the jury found that the C&O on its own, and, independently, Rollyson's, on its own, was each guilty of negligence that proximately caused the injury to Moore. The jury also found Moore guilty of contributory negligence, and awarded damages of $150,000.[1] Following the verdict, the court ruled that the indemnification agreement between the C&O and Rollyson's covered the damages awarded Moore. The court ordered Rollyson's to indemnify the C&O for the entire amount, and to reimburse the C&O for reasonable attorneys' fees and expenses incurred in defense of the suit, 493 F.Supp. 1252 (D.C.).
 
 
 4
 Consolidated here are the appeals of the C&O and Rollyson's. In 80-1587, the C&O[2] challenges its liability under the FELA. First, the C&O argues that Rollyson's negligence cannot be imputed to the C&O because Rollyson's was not an agent of the C&O. Second, the C&O argues that the FELA is inapplicable as a matter of law because the cafeteria was not a workplace and Moore was not within the scope of her employment at the time of her injury. The C&O also challenges two evidentiary rulings by the trial court.
 
 
 5
 In 80-1586, Rollyson's appeals the trial court's order that it indemnify the C&O. We find no merit in any of the challenges. We affirm the jury verdict, and the order that Rollyson's indemnify the C&O.
 
 
 6
 1. The C&O's Liability under the FELA for Rollyson's Negligence
 
 
 7
 The trial court instructed the jury that, if Moore's injury was caused by the negligent failure of Rollyson's to maintain safe conditions in the cafeteria, the negligence could be imputed to the C&O under the FELA.[3] The C&O argues that as a matter of law, Rollyson's negligence cannot be imputed to the C&O, because Rollyson's was neither an agent of the C&O nor a "constructive agent" under the doctrine of Sinkler v. Missouri Pacific R.R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958). In Sinkler the Supreme Court held that an independent contractor is an "agent" for purposes of establishing an employer's liability under the FELA if the contractor performs "operational activities" of the employer. 356 U.S. at 331-32, 78 S.Ct. at 762-63.
 
 
 8
 While the argument of the C&O is not without force, we find it unnecessary to determine whether Rollyson's negligence properly could be imputed to the C&O, because the C&O's liability under the FELA does not depend solely on the nature of its relationship with Rollyson's. The trial court further instructed the jury that, as part of the C&O's duty to provide a safe workplace, the C&O had a duty to prescribe rules and regulations for the safe operation of the cafeteria, and to require Rollyson's employees and agents to exercise reasonable care in operating the cafeteria. The court also required the jury to answer four special questions in reaching its verdict, the first of which asked: "Totally independent of any negligence of which Rollyson's Catering Service, Inc. may have been guilty, was the Chesapeake and Ohio Railway Company guilty of any negligence which proximately caused, or contributed in any degree to, the accident and injuries about which the plaintiff now complains?" The jury answered affirmatively.
 
 
 9
 From the court's instruction and the jury's answer to the first special question, it seems clear that the jury found that the C&O failed to provide and enforce adequate rules and regulations for the safe operation of the cafeteria.[4] The C&O has not appealed either the propriety of the court's instruction, or the accuracy of the jury's finding.[5] It is unnecessary, therefore, to pursue the question of whether the C&O, derivatively, could have been held responsible for the negligence of Rollyson's. The direct liability of the C&O under the FELA for the injuries to Moore has been established.
 
 2. Scope of Employment
 
 10
 A more difficult question is whether the cafeteria was a workplace and Moore was within the scope of her employment at the time of her injury. The FELA protects employees only if they are injured within the scope of employment. See, e. g., Getty v. Boston and Maine Corp., 505 F.2d 1226 (1st Cir. 1974). The C&O acknowledges that an employee injured during a temporary and necessary interruption of work such as a rest break, a trip to a drinking fountain or restroom remain within the scope of employment and within the protection of the Act. Several cases have held, or stated in dictum, that an employee injured while eating lunch on the employer's premises also remains within the scope of employment. See Virginian Ry. Co. v. Early, 130 F.2d 548 (4th Cir. 1942); Baltimore & O. R.R. Co. v. Kast, 299 F. 419 (6th Cir. 1924).
 
 
 11
 The C&O argues that the facts here present two significant distinctions from the lunch cases. First, the employees in the lunch cases, in a manner designed to benefit the employer, were required to eat lunch on the premises. Moore was free to eat lunch in the cafeteria, or to leave the building and eat elsewhere, at a place of her choice. The C&O contends that the cafeteria was provided merely as a convenience for the employees, not for the benefit of the employer. Second, in the cases relied on by Moore, the employees were injured on premises controlled by the employer. Moore, although on premises owned by the C&O, was injured in a cafeteria operated by Rollyson's.
 
 
 12
 The C&O relies on two First Circuit cases to demonstrate the significance of the distinctions it endeavors to make. In Metropolitan Coal Co. v. Johnson, 265 F.2d 173 (1st Cir. 1959), a railroad employee was injured as he commuted from home to work on his employer's regularly scheduled commuter train. The court held that the employee was not within the scope of his employment at the time of injury, even though the employee was on the employer's premises, and had been given a pass to ride the train. The court said that
 
 
 13
 although the plaintiff was on the carrier's premises when he was injured, he was not on a part of the premises which it was necessary for him to use to reach his work. He was not required to go to work on the defendant's passenger train. He could have taken any one of a number of other routes, trains or means of transportation to go from his home to his work (T)he plaintiff's employment as a flagman on a freight train did not subject him to any peculiar or abnormal danger while he was riding to work on one of his employer's passenger trains. On that train he was exposed to no other or greater hazard than any other passenger.
 
 
 14
 265 F.2d at 178.
 
 
 15
 The First Circuit refined the meaning of "employer compulsion" in Getty v. Boston and Maine Corp., 505 F.2d 1226 (1st Cir. 1974). A railroad employee who had slipped in a parking lot serving the railroad station as he walked to board a commuter train to work, argued that he was within the scope of employment because a heavy snowstorm made other forms of transportation impractical and in effect compelled him to take the train to work. The court held, however, that there was no "employer compulsion":
 
 
 16
 The sort of necessity referred to in Metropolitan Coal must, we think, stem more directly from a specific requirement of his job or a specific understanding as to his mode of travel. There will always be circumstances outside the employer's control conditioning an employee's choice While any of these circumstances might make alternative ways of commuting impracticable on a given day, the result must ultimately be attributed to employee decisions over which the employer ordinarily has no control (A)bsent circumstances indicating a special relationship with one's employer, subjective choices of where to live and how to travel are insufficiently related to employment to determine the coverage of the federal statute.
 
 
 17
 505 F.2d at 1227-28.
 
 
 18
 Although Metropolitan Coal and Getty emphasize the importance of "employer compulsion" in determining the scope of employment, we do not read either decision to make "employer compulsion" the dispositive criterion here. The accident in each case occurred miles from the workplace, as the employee commuted to work. At both common law and under the FELA, an employee commuting to or from work ordinarily is not within the scope of employment.[6] The reason, as the passage quoted above from Getty indicates, is that an employer has no control over the employee's environment. The courts in both Metropolitan Coal and Getty expressed concern that, unless the employer compelled the employee to take the train to work, a finding that the employee was within the scope of employment would extend employer liability to situations over which it exercised no control.[7]
 
 
 19
 The concerns expressed in Metropolitan Coal and Getty are not as relevant here. Unlike an employee commuting to or from work, an employee eating lunch on the premises generally is considered within the scope of employment. At common law, courts have held that an employee is within the scope of employment if the employer invites the employee to remain on the premises during lunch.[8] Under the FELA, the presence of employer compulsion has contributed to a finding that an employee was within the scope of employment while eating lunch,[9] but the absence of employer compulsion has not defeated such a finding. In Mostyn v. Delaware, L. & W. R.R. Co., 160 F.2d 15 (2d Cir. 1947), an employee who had left his bunk in a bunk car because it was verminous was injured as he slept by the side of the tracks. Judge Learned Hand held that the employee was within the scope of employment at the time of injury, even though the employee was not required to sleep in the bunk car, but could have slept in town as other workmen did. Judge Hand said that "when a railroad provides shelter or food or both for its employees, and they are using the accommodations so provided to prepare themselves for their work, or to rest and recuperate, they must be regarded as in its 'employ.' " 160 F.2d at 18.
 
 
 20
 The same reasoning applies here. Although the C&O did not require its employees to eat in the cafeteria, the cafeteria nevertheless enhanced the possibility of increased productivity by the employees. Representatives of the C&O acknowledged in their testimony that the C&O received some benefit from the cafeteria, because the cafeteria improved employee morale and enabled employees with short lunch periods to return to work on time. Further, use of the cafeteria was restricted to C&O employees and occasionally their guests. Unlike the employees in Metropolitan Coal and Getty, who rode the trains as commuters, Moore ate lunch in the cafeteria as an employee. The C&O may not have known that a particular employee would eat lunch in the cafeteria on a particular day, but it did know that its employees were required to eat lunch as a necessary incident of their employment, and that persons who ate in the cafeteria would be employees.
 
 
 21
 Those circumstances establish that if the C&O had operated the cafeteria itself, the cafeteria would have been part of the workplace and Moore would have been within the scope of employment. The fact that Rollyson's operated the cafeteria, without a lease, does not alter the conclusion. As the trial court noted, the C&O did not relinquish all control of the cafeteria, but through the agreement with Rollyson's, retained almost complete control over many of the details of operation.[10] The jury found the C&O negligent in an area in which the C&O retained control prescribing and enforcing regulations for safe operation of the cafeteria. Here, unlike Metropolitan Coal and Getty, a finding that Moore was within the scope of employment would not impose liability in a situation in which the employer exercised no control over the environment of the employee as an employee.[11]
 
 3. Evidentiary Challenges
 
 22
 a. Pat of Butter Test
 
 
 23
 On direct examination, Moore testified that several weeks before trial she placed three pats of butter on a condiment table in the cafeteria to determine how long butter took to melt. She testified that the butter became soft after 20 minutes, and melted completely after 45 minutes. Presumably the purpose of the testimony was to prove that the butter had been on the floor long enough to give Rollyson's constructive notice of the condition. The C&O argues on appeal that the court should have excluded the testimony, because no evidence was introduced at trial to prove that the butter was soft or melted when Moore stepped on it. Several witnesses testified that the pat was nothing more than a foot-long smear after the accident, but no one saw the butter before the accident.
 
 
 24
 Our holding that the C&O was liable directly for its own negligence renders any error in admission of the testimony harmless. The testimony is relevant to Rollyson's negligence in failing to police the cafeteria area, not to the C& O's independent negligence in failing to provide and enforce adequate rules and regulations for safe operation of the cafeteria. To the extent that the testimony may have influenced the jury's finding of the C&O's independent negligence, sufficient evidence was introduced on the issue to allow us to say that no substantial right of the C&O was affected.[12] See F.R.C.P. 61.
 
 
 25
 b. Moore's Future Earning Capacity
 
 
 26
 At trial an economist testified that Moore's future earning capacity before the injury was $457,396. The C&O argues that the testimony was irrelevant, because no evidence was introduced that Moore would suffer any future loss of earnings. Although Moore could not perform her work as mail clerk following the accident, she has returned to work as a contract clerk, a position in which she is paid more than she was in her previous job as a mail clerk.
 
 
 27
 The argument is without merit. That Moore's earnings increased after the accident does not bar recovery for loss of future earning capacity; in fact, "a comparison of earnings before and after the injuries is not a particularly significant or controlling consideration where there was evidence before the jury to support the conclusion that the injuries will adversely affect plaintiff's future employment possibilities." Lawrence v. Norfolk Dredging Co., 319 F.2d 805, 809 (4th Cir. 1963), cert. denied, 375 U.S. 952, 84 S.Ct. 443, 11 L.Ed.2d 313 (1963); see also Flick v. James Monfredo, Inc., 356 F.Supp. 1143 (E.D.Pa.1973), aff'd mem., 487 F.2d 1394 (3d Cir. 1973).
 
 
 28
 Here there was undisputed medical testimony that Moore suffered permanent injury to her back and spine that would make it difficult for her to compete in the job market. Moore was under no obligation to keep her current position as a contract clerk for the rest of her life. The jury could consider her desire to work at other jobs, now foreclosed by the consequences of the negligence of the C&O. Nor is there anything to insure that the contract clerk position or any viable alternative position would be available to Moore the rest of her working life. The economist's testimony therefore was highly relevant to any loss she might suffer upon entering the job market again.
 
 4. Indemnification Agreement
 
 29
 The final issue to be determined involves Rollyson's separate appeal concerning the scope of its indemnification agreement with the C&O. Three provisions of the agreement are relevant to the appeal. First, Rollyson's agreed to indemnify the C&O for all liability "caused either in whole or in part by, arising out of, resulting in any manner from, or connected in any manner whatsoever with an act or omission of" Rollyson's. Second, Rollyson's agreed to indemnify the C&O for all liability "arising out of the dispensing or consumption by any person of food, beverages or tobacco products." Third, Rollyson's was "solely responsible" for all liability to any Rollyson's employee "connected with the performance of this agreement, without regard to whether any such deaths or injuries are caused by or attributable in whole or in part to the negligence of Chesapeake Company, its employees or agents."
 
 
 30
 Rollyson's argues that a comparison of the third provision with the first two provisions creates an ambiguity as to the scope of the agreement which must be resolved against the C&O as drafter. See Nisbet v. Watson, 251 S.E.2d 774, 780 (W.Va.1979). The third provision specifically requires Rollyson's to indemnify the C&O for all injuries to Rollyson's employees, even if the sole cause of the injury was the negligence of the C&O. If, Rollyson's argues, the parties had intended Rollyson's to indemnify the C&O for any injury to C&O employees or other persons caused solely by the C&O's negligence, the first two provisions would have contained the same express language. That the two provisions do not contain such language purportedly indicates that the parties did not intend for Rollyson's to indemnify the C&O for injuries caused solely by the negligence of the C&O. Because, the contention runs, the jury found the C&O guilty of negligence totally independent of any negligence of Rollyson's, Moore's injury is outside the scope of the agreement.
 
 
 31
 The trial court rejected the argument, holding that either the first and second provisions of the agreement required Rollyson's to indemnify the C&O for the damages awarded Moore. The court held the first provision applicable because the jury found that the accident was caused in part by the negligence of Rollyson's. The court held the second provision applicable because the jury found that the accident "arose out of the dispensing or consumption of food in the cafeteria."[13]
 
 
 32
 We do not address the court's analysis of the first provision of the agreement, because we have not addressed the question of Rollyson's negligence in other parts of the opinion. We affirm, however, the court's ruling that the second provision of the agreement obligates Rollyson's to indemnify the C&O for the damages awarded Moore. As the trial court noted, under West Virginia law, the plain meaning of a contract's terms must be given full effect. See Nisbet v. Watson, supra, at 780. The second provision expressly obligates Rollyson's to indemnify the C&O for all injuries arising out of the dispensing or consumption of food.
 
 
 33
 Despite Rollyson's arguments to the contrary, the plain meaning of the second provision is consistent with the indemnification agreement as a whole. Our reading of the agreement convinces us that the C&O and Rollyson's bargained to make Rollyson's responsible for all injuries connected with operation of the cafeteria for injuries caused at least in part by Rollyson's negligence, for injuries to Rollyson's employees, and for injuries arising out of the consumption of food. The second provision does not contain the same language as the third provision, because injuries to others than Rollyson's employees could occur in the cafeteria caused by the C&O's negligence and unconnected with the consumption and dispensing of food. For those the C&O would not be indemnified. Here the jury found that Moore's injury arose out of the consumption and dispensing of food, and we affirm the trial court's ruling that Rollyson's must indemnify the C&O based on the second provision of their agreement.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 The verdict stated simply, "We the jury find for the plaintiff and against the defendant Chesapeake and Ohio Railway Company and assess her damages at $150,000." The jury also answered four special questions. The first three questions asked whether each of the three parties was guilty of negligence which proximately caused the accident; the fourth question asked whether the accident arose out of the dispensing or consumption of food in the cafeteria. The jury answered yes to all questions. Because the jury was instructed to reduce Moore's award if it found her negligent, we assume that the jury derived the $150,000 figure from the amount Moore requested, reduced by the percentage to which Moore's own negligence contributed to the accident. The allocation of the award does not bear on the outcome of the appeal
 
 
 [2]
 Although not named as a defendant in Moore's suit against the C&O, Rollyson's has joined the C&O on brief
 
 
 [3]
 The FELA extends employer liability to the negligence of the employer's "officers, agents, or employees." 45 U.S.C. § 51
 
 
 [4]
 The agreement between the C&O and Rollyson's specified that Rollyson's would employ, train, and provide a uniformed attendant to service and maintain the equipment and the food service area, bus and clean tables, and assist C&O employees during lunch. The agreement also specified that Rollyson's would maintain the cafeteria in a sanitary and orderly manner, provide a trash container that would be emptied daily, and provide personnel to bus and clean the tables immediately after use. Finally the agreement specified that Rollyson's would be responsible for complete janitorial service, which required Rollyson's each day to wipe the tables and chairs, sweep the dining room floor, mop the kitchen floor, and spot-mop spills; twice each week mop the dining room floor, and twice each year strip and wax the dining room floor
 At trial, the cashier testified that she and the cook were the only Rollyson's employees on duty during the lunch hour; no uniformed attendant was employed. She also testified that it was her responsibility to bus trays and clean spills in addition to operating the cash register, and that on most occasions she did not clean the cafeteria until there was a break in the line of customers or until the cafeteria closed. The jury could have concluded from the testimony either that the C&O failed to enforce the regulations specified in the agreement, or that the regulations were inadequate to maintain safe conditions.
 
 
 [5]
 The C&O did argue, in its motion for a judgment notwithstanding the verdict or a new trial, that no evidence was introduced at trial that the C&O negligently failed to provide and enforce adequate regulations for safe operation and cleaning of the cafeteria. The trial court ruled that the question of the C&O's negligence was for the jury to decide. Because the C&O has not raised the claim either in its brief or at oral argument, the claim is abandoned. See Harris v. Plastics Mfg. Co., 617 F.2d 438, 440 (5th Cir. 1980); Moore v. Midgette, 375 F.2d 608, 611 n.3 (4th Cir. 1967)
 
 
 [6]
 See, e. g., Sassaman v. Pennsylvania R.R. Co., 144 F.2d 950 (3d Cir. 1944); Brinkmann v. Liberty Mutual Fire Ins. Co., 63 Cal.2d 41, 46, 45 Cal.Rptr. 8, 11, 403 P.2d 136, 139 (1965) ("It is a well-recognized rule that an employee is not within the scope of employment while going to and coming from work (unless) the employer, as an incident of the employment, furnishes his employee's transportation and the means of transportation is under the control of the employer.")
 
 
 [7]
 The C&O argues that to distinguish Metropolitan Coal and Getty on the ground that the injuries occurred far from the workplace ignores the rationale of the decisions. We note, however, that each court was aware of the distinction in reaching its holding. In Metropolitan Coal the court said that "it seems to us unwarranted to extend the coverage of the Act to an employee who is miles away from his job and only proceeding to it in a public conveyance, operated to be sure by the defendant-employer, but still only one of several other means of transportation the plaintiff might have chosen." 265 F.2d at 178. In Getty, the court emphasized that Congress, in enacting the FELA, did not intend that the fortuity of an employee's choice of transportation should alter the usual principle that an employee commuting to work is not within the scope of employment. 505 F.2d at 1228
 
 
 [8]
 See, e. g., Holman v. American Automobile Ins. Co., 201 Ga. 454, 39 S.E.2d 850 (1946); Callahan v. New England Tel. & Tel. Co., 216 Mass. 334, 103 N.E. 922 (1914). In Callahan, the court held that an employee who was injured when a chair in a lunchroom collapsed was within the scope of employment because the employee was given the right to use the lunchroom in her employment contract. In Holman, the court held that an employee who slipped and fell in a company cafeteria was within the scope of employment:
 if an employer operates a cafeteria on its premises, in the immediate vicinity of work, at which its employees are invited to eat, and they accept the invitation by using the facilities provided, the relation of master and servant is not temporarily suspended during the noon hour , and it would be the duty of the employer to operate and maintain its cafeteria, as part of its premises, as a reasonably safe place to eat.
 
 
 [201]
 Ga. at 459, 39 S.E.2d at 854
 Because the decisions in Callahan and Holman are based on common law, of course, their results rest on principles distinct from those to be considered for purposes of decision under the FELA. But the decisions do suggest that our conclusion is not an unwarranted extension of employer liability under the FELA, as the C&O contends. While what would not be grounds at common law may still suffice for an FELA recovery, the opposite is rarely the case. What could support a common law recovery customarily, even a fortiori, leads to recovery under the FELA.
 
 
 [9]
 See, e. g., Carter v. St. Louis, T. & E. R.R. Co., 307 Mo. 595, 271 S.W. 358 (Mo.1925); Brock v. Chicago, Rhode Island & Pennsylvania Ry. Co., 305 Mo. 502, 266 S.W. 691 (1924)
 
 
 [10]
 The trial court characterized the relationship between the C&O and Rollyson's as licensor-licensee rather than lessor-lessee. The court noted that the agreement contained almost none of the hallmarks of a lease. The agreement used none of the words that usually denote a lease, but stated that the C&O was willing to permit Rollyson's to enter the premises at all reasonable times to sell food and beverages. Rollyson's paid no rent, but retained all profits and paid all costs incident to operation of the cafeteria. The C&O provided heat, air conditioning, water and electricity. Rollyson's provided all equipment and employees to operate the cafeteria
 The trial court also found that the detailed control the C&O exercised over operation of the cafeteria inconsistent with a leasehold. In addition to provisions for cleaning the cafeteria, see note 4, supra, the agreement contained provisions regarding hours of operation, menu quality and variety, decor, and furnishings. The agreement also limited use of the cafeteria to C&O employees and their guests.
 
 
 [11]
 The situation perhaps would be very different if Rollyson's had leased the cafeteria from the C&O. A bona fide lease which conferred control on Rollyson's and opened the cafeteria to the general public could well have ended the status of the cafeteria as part of the workplace provided by the C&O for Moore's activities as an employee
 
 
 [12]
 See note 4, supra
 
 
 [13]
 See note 1, supra