**Opinion issued January 28, 2020.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00181-CV

_____

**RICHARD HAYNES, Appellant**

**V.**

**UNION PACIFIC RAILROAD COMPANY, A CORPORATION, Appellee**

On Appeal from the 189th District Court
Harris County, Texas
Trial Court Case No. 2006-40557

## O P I N I O N

Appellant Richard Haynes was injured as he attempted to leave the Strang Railyard where he worked for appellee Union Pacific Railroad Company (UP). Haynes sued UP under the Federal Employment Labor Act (FELA), and the jury ultimately concluded that UP was negligent, determining that UP was 35%

responsible and Haynes was 65% contributorily negligent regarding his injuries. The jury awarded Haynes a total of $1,095,000 in damages, and the trial court rendered judgment on this verdict after reducing it for Haynes's contributory negligence and two liens. On appeal, Haynes argues that (1) the trial court erroneously charged the jury on aggravation of a pre-existing condition; (2) the trial court repeatedly showed bias against and hostility toward Haynes and his counsel; and (3) even if "the foregoing errors, standing alone, were insufficient to warrant a new trial, their cumulative effect deprived [Haynes] of a fair trial and require that a new trial be granted on all issues." In a cross-appeal, UP argues that (1) the FELA does not apply to Haynes's claims because he was not acting in the course of his employment with UP at the time he was injured, and, thus, Texas's proportionate responsibility statute bars any recovery at all by Haynes; and (2) alternatively, the trial court should have applied an offset for railroad retirement taxes.

We conclude that the FELA applies to Haynes's claim against UP, that the trial court's charge was not erroneous, that the record does not support Haynes's claim of bias or cumulative harm, and that UP was entitled to the offset for railroad retirement taxes. Accordingly, we modify the judgment to apply the offset and affirm the judgment as modified.

## Background

Haynes worked for UP as a carman, responsible for inspecting and repairing rail cars. At the time of his injury, Haynes had worked for UP for approximately seven years and had been assigned to the Strang Yard, the railyard where he was injured, for between six and eight months.

On April 1, 2005, the day of his injury, Haynes had received permission from his supervisor to leave work approximately thirty minutes before the regular end of his shift so that he could say goodbye to his wife and daughter before they left on a trip. At the time Haynes attempted to leave the Strang Yard, a "humping" operation was ongoing.

A humping operation involves breaking apart an incoming train, one rail car at a time, and allowing the cars to roll down a "hump track" into an area called the "bowl." In the bowl, there are several different tracks (the bowl tracks) where the cars can then be put back together to form different outbound trains. The humping operation starts with a locomotive engine pushing from the back of the incoming train to shove the rail cars down the hump track until the forward-most car reaches a point called the pin-puller's spot. At the pin-puller's spot, an employee called the pin-puller or carman pulls a lever between the forward-most car and the next car, disconnecting the forward-most car from the rest of the incoming train. The downward slope of the hump track causes the released car to free-roll down into

the bowl where the car is assembled into a new outbound train. The pin-puller repeats this process, releasing the cars from the incoming train until all of the cars are coupled to new, outbound trains.

The humping operation happening on the afternoon of April 1, 2005, blocked the main crossing out of the parking lot where Haynes had parked that day, and the operation was likely to continue for approximately twenty to thirty more minutes. The parking lot also had four other exits. One of those, however, was locked, and two were in a state of disrepair. The fourth route, and the one Haynes chose to take that afternoon, involved crossing the hump track at a place called the "tower crossing" and then continuing to the main road. The tower crossing was steep, narrow, and poorly maintained. It had been designed primarily for use by all-terrain vehicles or "four-wheelers," but workers also crossed it in their personal vehicles on a regular basis.

Haynes testified that he had used the tower crossing on multiple occasions during humping operations, driving both his work truck and his personal vehicle. He testified that he had even crossed at the tower crossing during humping operations with his supervisor in the truck with him. Other employees likewise testified that employees and managers used the tower crossing in both company and personal vehicles during humping operations, when the main crossing was blocked. For example, a former UP employee, who had worked in the Strang Yard

4

around the time Haynes was injured, testified that he had observed a variety of vehicles cross the tower crossing while humping operations were blocking the main exit. He stated that "all the car people" would cross over in their personal vehicles and on the "four-wheelers that they rode during their shift," and he testified that he would also see "the company officers' jeeps go across . . . if the other crossing was blocked." He further testified that it was "a common practice" for people to cross the tower crossing in a company or personal vehicle "with the humping operation still going on."

Haynes testified that, when he approached the tower crossing on April 1, 2005, he looked up the hump track and did not see any cars rolling toward him down the hump track. He honked his horn to get the attention of the pin-puller who was releasing the train cars down the hump track. He saw the pin-puller walk "back towards the back of the cars," back up the hump track away from Haynes's car at the tower crossing. Haynes believed that the pin-puller would have to walk back to the point known as the pin-puller's spot, "pull the cart lever and hold it and walk back to the line and then release [the next car]." Haynes testified that it appeared the last rail car on the incoming train had recoiled back up the hill, away from him, so he believed that he had adequate time to cross the tower crossing in his vehicle, a Honda Accord. However, as he attempted to cross, he became stuck in the center of the crossing. He was unable to move his vehicle, either because the

5

tower crossing was too steep or too narrow, and he was unable to open the driver's door because the handle broke. Another rail car came down the hump track and struck Haynes's vehicle, pushing it down the hump track into the bowl. At that point, Haynes was able to jump out of his vehicle's window, and he landed on the ground in the bowl. He heard another rail car heading toward him, but the employee conducting the humping operation saw what had happened and rerouted the rail car onto a different bowl track.

As a result of the April 1, 2005 accident, Haynes suffered numerous serious injuries, including a dislocated femur, fractured pelvis, damaged left shoulder, fractured ribs, and a closed head injury. He required several surgeries, including a total hip replacement and two shoulder surgeries. Haynes also presented evidence that the accident aggravated several pre-existing conditions. Haynes had a history of cervical spine problems that had been caused by previous automobile accidents, resulting in neck pain and radiating pain in his upper extremities. Prior to his April 1, 2005 accident, Haynes had received treatment for the cervical spine injuries from Dr. Stephen Charnov, who treated him with pain medications and steroid injections. These treatments provided Haynes with relief of his symptoms, so that he could remain active, and, although his doctor had discussed surgical treatment, Haynes had not found such treatment necessary.

Following the accident, Haynes claimed that his cervical spine injury was aggravated. Dr. Charnov and Dr. Vivek Kushwaha, who treated Haynes after the April 1, 2005 accident, likewise testified that his pre-existing injury was aggravated. Haynes testified and presented expert testimony that his pain increased, that his radiating pain shifted from his right arm to his left, and that his symptoms could no longer be improved by rest and the use of pain medication or injections. As a result of the aggravated injury, Haynes underwent spinal surgery, and Drs. Charnov and Kushwaha testified that the aggravation caused by the train accident had contributed to the need for this surgery. On the other hand, UP provided expert testimony from Dr. Greider that none of the injuries to Haynes's neck or left shoulder had been caused by the April 1, 2005 accident and was entirely pre-existing.

Haynes also presented evidence that, prior to the accident on April 1, 2005, he experienced occasional depression and, at times, took medication to treat the condition. After the accident, he sought additional treatment, and his treating physicians, Drs. Daniella White and Richard Lourie, indicated that the accident caused post-traumatic stress disorder (PTSD) and secondary, severe depression. Both doctors opined that Haynes's pre-existing mental health involved only mild and intermittent depression, and his PTSD and severe depression were new conditions unrelated to his pre-existing condition. Haynes's also presented

evidence from Dr. Larry Pollock that he had suffered a mild traumatic brain injury caused by the April 1, 2005 accident that impacted his cognitive and executive functioning.

Haynes first tried his case in 2008. The 2008 jury found that Haynes was 70% responsible for his injuries and UP was 30% responsible. It awarded him damages totaling $1,521,000, which the trial court reduced by 70% and awarded Haynes $455,300. That judgment, however, was overturned on appeal to this Court on the basis of error during jury selection, and a new trial was ordered. *See Haynes v. Union Pacific R. Co.*, 395 S.W.3d 192, 201 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

In 2017, the case was tried again. The parties presented evidence regarding the circumstances of the accident and the nature of Haynes's injuries. Haynes asserts that, on several occasions, including during jury selection, during witness testimony, and during closing statements, the trial court demonstrated "bias and hostility" toward him and his counsel. This resulted in Haynes's requesting a mistrial at one point, which the trial court denied.

Haynes also objected to the trial court's jury charge, specifically the portion of the charge that instructed the jury about how to apportion damages for the aggravation of his pre-existing injuries, and that objection was overruled.

Ultimately, the jury again found UP liable. The jury determined that Haynes was 65% responsible for his injuries, and it found that UP was 35% responsible. The jury found that Haynes's total damages were $1,095,000, including amounts for past and future physical impairment, past and future physical pain and mental anguish, future medical expenses, and lost wages. UP moved for JNOV seeking a take-nothing judgment based on its argument that FELA did not apply to Haynes's claims and that, because he was found to be more than 50% responsible for his injuries, Texas's proportionate responsibility statute barred any recovery. Haynes also filed a motion for new trial. The trial court denied both motions. It reduced the jury's damages by 65%, applied offsets for outstanding liens, and rendered final judgment, awarding Haynes $358,195.88. This is the judgment that both Haynes and UP now appeal.

## FELA

In its first issue on cross-appeal, UP argues that the FELA does not apply to Haynes's claims. UP asserts that Haynes was not acting within the scope of his employment in interstate commerce when he chose a dangerous exit over a safe one, and, because FELA does not apply, Texas's proportionate responsibility statute bars any recovery by Haynes.[1]

---

[1] We note that federal law generally governs the substantive rights of the parties in FELA cases, but when such cases are filed in state courts, they are tried in accordance with that state's own applicable rules of civil procedure. *BNSF Ry. Co.*

The FELA provides a remedy to "any person suffering injury while he is employed by [a common carrier by railroad] in [interstate] commerce" for injury "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, . . . or other equipment." 45 U.S.C. § 51. Thus, for FELA to apply, the plaintiff must establish that the injury occurred in the scope of his employment. *See id.*; *Smith v. Med. & Surgical Clinic Ass'n*, 118 F.3d 416, 419 (5th Cir. 1997); *Feichko v. Denver & Rio Grande W. R.R. Co.*, 213 F.3d 586, 592 (10th Cir. 2000).

"FELA's 'scope of employment' requirement has been interpreted broadly," and "[i]t is not limited to acts required or coerced by the employer." *Smith*, 118 F.3d at 419. "Rather, the scope of employment encompasses 'acts incidental to the employment as well as the actual work.'" *Id.* (quoting *Fowler v. Seaboard Coastline R.R. Co.*, 638 F.2d 17, 20 (5th Cir. Feb. 1981)); *see Feichko*, 213 F.3d at 592; *see also Rostocki v. Consol. Rail Corp.*, 19 F.3d 104, 106 (2nd Cir. 1994) (FELA covers injuries suffered during activities necessarily incidental to employment); *Wilson v. Chicago, Milwaukee, St. Paul, & Pac. R.R. Co.*, 841 F.2d 1347, 1355 (7th Cir. 1988) (act could be within scope of employment if it is

---

*v. Phillips*, 485 S.W.3d 908, 910 (Tex. 2015); *Dutton v. S. Pac. Transp.*, 576 S.W.2d 782, 783–84 (Tex. 1978).

necessary incident of day's work). "'[P]urely private activity totally unrelated to the employment' is not within the scope of employment." *Smith*, 118 F.3d at 419.

The Fifth Circuit has held that "the proper test for scope of employment in a[] FELA case [is] whether the act was one which the employer might reasonably have foreseen and which the employee might reasonably have thought necessary in the interest of or in the benefit of the employer." *Id.* Federal courts have recognized that the course and scope of employment includes "passage across the employer's premises to and from the place of work where that is a necessary incident of the day's work." *See, e.g.*, *Morris v. Pa. R.R. Co.*, 187 F.2d 837, 841 (2nd Cir. 1951); *see also Erie R.R. Co. v. Winfield*, 244 U.S. 170, 173 (1917) ("In leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment."). In *Morris*, the Second Circuit considered a situation "where the decedent was killed on the defendant's property only shortly before he was to report for work" and stated, "there can be no doubt that [the decedent] was in the course of his employment unless, as the railroad contends, recovery is barred because he entered the yard at the wrong point." *Morris*, 187 F.2d at 841.

Considering the "proper test for scope of employment in a FELA case," we conclude that Haynes's exiting Union Pacific's property when and how he did was an act that Union Pacific "might reasonably have foreseen" and one that Haynes

11

"might reasonably have thought necessary in the interest of or in the benefit of the employer." *See Smith*, 118 F.3d at 419. It was necessary for Haynes to exit the premises in connection with ending his work day. *See id.* He had obtained special approval to leave work at the time he exited the premises and was injured, the main exit from the premises was blocked by humping operations, and he had to exit Union Pacific's property somewhere. *See Morris*, 187 F.2d at 841 (holding that injured employee "had to enter [the railroad's property] somewhere"). The evidence further demonstrated that Haynes exited the premises using the tower crossing, a paved crossing that Haynes and others had regularly used for that purpose. UP argues that the tower crossing was not intended to be used by regular passenger vehicles, but Haynes presented evidence that he and other employees had used the crossing as an exit, and that, on at least one occasion, he had used the crossing with his supervisor in the vehicle with him. In light of this evidence, we conclude that Haynes's act of exiting at the end of his work day by way of the tower crossing was something that Union Pacific might reasonably have foreseen. *See Smith*, 118 F.3d at 419.

UP argues that this case is similar to *Krysiak v. Pennsylvania Railroad Co.*, in which the Third Circuit held that the injured employee had "ended his employment and lost the status of employee in interstate commerce" and became "a mere volunteer on the defendant's tracks" when he ignored the safe method of

12

passage provided by his employers and instead "pursued a course, for his personal convenience, across the yard tracks and main tracks of the Railroad Company," where he was struck by an oncoming train and killed while walking on the tracks. 270 F. 758, 759–60 (3rd Cir. 1921). Haynes's case is distinguishable from *Krysiak*. In *Krysiak*, the court noted that, while the ground around the area where the employee crossed the tracks on foot "was packed down by the feet of many employees, who were in the habit of leaving the yard in any direction they chose," there was no showing of "a beaten pathway across the tracks suggestive of invitation or permissive way." *Id.* at 759. Thus, in *Krysiak*, the employee left the provided safe passage to make his own crossing at the time he was struck and killed. *Id.* Haynes, however, did not choose to cross the yard tracks or main tracks of the Strang Yard at some unapproved or self-selected location. He crossed at the tower crossing—a paved crossing that he and others had routinely used when the main exit was blocked by ongoing humping operations and that Haynes had even used on one occasion with his supervisor in his vehicle.

> We further observe that, in *Krysiak*, the court noted:

> [W]e are not passing on a case where an employee, leaving employment in interstate commerce, selects one of several more or less dangerous means of exit from his place of employment because his employer had provided him no safe means; but we are passing on a case where the employer had provided a safe way out and the employee, ignoring it, selected a dangerous way.

*Id.* at 760.

13

UP argues that this is not a case in which the railroad had provided no reasonably safe means of access, because it had provided the main exit, which was wide, flat, and designed for all vehicles, that Haynes could have used. We observe, however, that the main exit was blocked by humping operations at the time of the accident and the other routes out of the lot were likewise circuitous and in disrepair. There was evidence, therefore, that it was reasonably necessary for Haynes to use a different exit than the main exit when he left. *See, e.g.*, *Morris*, 187 F.2d at 841–42 (noting that jury found "that the railroad had provided no reasonably safe means of access" to the premises and rejecting railroad's assertion that existence of "better" exit should prevent employee's recovery where railroad failed to prove as matter of law that suggested exit was reasonably safe); *Young v. N.Y., New Haven & Hartford R.R. Co.*, 74 F.2d 251, 252 (2nd Cir. 1934) ("[I]f there are alternative ways of reaching the job, one across the employers' property and another elsewhere, the employer's liability will depend upon whether it is 'reasonably necessary' for the workman to use the first, or whether he does so merely for his 'convenience.'"); *see also Coleman v. Reading Co.*, 29 A.2d 499, 501 (Pa. 1943) (distinguishing *Krysiak*, and ruling in favor of injured employee when railroad "showed there was in existence a safe but more lengthy route" but failing to show that route was specifically provided for employees' safety or that it was brought to employee's knowledge prior to his accident).

We cannot conclude as a matter of law that Haynes used the tower crossing merely for his own convenience in a way that converted him from an employee in interstate commerce to a "mere volunteer" or licensee or permittee. *See Krysiak*, 270 F. at 760; *see also Pa. R.R. Co. v. Burgerson*, 296 F. 311, 314 (3rd Cir. 1924) ("[W]here workmen (as [Burgerson] here) are not actually engaged in their work but are using the tracks as a convenient way from one place to another, the rule of law is that they assume the risks and the railroad company owes them no duty other than to refrain from wanton, reckless or willful injury. Thus they become licensees or permittees."). At the time Haynes attempted to leave the Strang Yard—with the permission of his supervisor—the tower crossing was the only crossing not completely blocked by ongoing humping operations or otherwise in disrepair; therefore, there is at least some evidence that it was reasonably necessary for him to cross there, as opposed to that route being one of mere convenience. *See Burgerson*, 296 F. at 314; *Krysiak*, 270 F. at 759–60; *see also Hendricks v. N.Y., New Haven & Hartford R.R. Co.*, 167 N.E. 449, 450 (N.Y. 1929) (distinguishing *Krysiak* and holding, "If, as matter of fact, plaintiff could not safely alight from the right side of the train, he did not, as [a] matter of law, deviate from his employment when he made his exit on the left.").

Finally, we observe that the law does not ask us to analyze all of the various routes that Haynes might have taken to exit the yard at the end of his shift. The

15

modern test for whether an employee was acting in the scope of his employment asks us to consider whether "the act was one which the employer might reasonably have foreseen and which the employee might reasonably have thought necessary in the interest of or in the benefit of the employer." *See Smith*, 118 F.3d at 419. As set out above, it was foreseeable to UP that an employee in Haynes's position—needing to exit the yard at the end of his shift, while humping operations blocked the main exit—would use the alternate route over the tower crossing. And it was an act that Haynes might have reasonably thought necessary, given that exiting the yard was a necessary incident to his employment at UP. *See id.*; *see also Winfield*, 244 U.S. at 173 ("In leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment."); *Morris*, 187 F.2d at 841 (holding same). UP failed to establish that, in leaving as he did, Haynes was engaged in a "purely private activity totally unrelated to [his] employment" that would not fall within the scope of his employment. *See Smith*, 118 F.3d at 419.

We conclude that the FELA applies, and we overrule UP's first cross-issue.

## Charge Error

Having determined that FELA applies and rejecting UP's assertion that it is entitled to rendition of judgment in its favor, we turn to Haynes's complaints seeking a new trial. In his first issue on appeal, Haynes argues that the trial court

16

erred in charging the jury with regard to apportioning damages for aggravation of pre-existing injuries.

## A. Standard of Review

A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. A jury instruction is proper if it (1) assists the jury; (2) accurately states the law; and (3) finds support in the pleadings and evidence. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *see* TEX. R. CIV. P. 278. We review the trial court's submission of jury instructions for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles, or when it misapplies the law to the established facts of the case. *See Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

If we determine that an incorrect jury instruction was given, we nevertheless reverse only if the instruction was reasonably calculated to and probably did cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006). We examine the entire record and apply traditional harmless error analysis to determine whether the instruction probably caused the rendition of an improper judgment. *Urista*, 211

17

S.W.3d at 756; *see Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (charge error is generally considered harmful if it relates to contested, critical issue).

## B.     The Court's Charge

The record contained evidence that Haynes had several pre-existing injuries that were allegedly aggravated by the April 1, 2005 accident. As a general rule, "when a defendant's negligence aggravates a plaintiff's pre-existing health condition, the defendant is liable only for the additional increment caused by the negligence and not for the pain and impairment that the plaintiff would have suffered even if the accident had never occurred." *Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 601 (1st Cir. 1996); *see BNSF Ry. Co. v. Epple*, No. 07-15-00355-CV, 2016 WL 7010581, at *2 (Tex. App.—Amarillo Nov. 30, 2016, pet. denied) (mem. op.) (citing, among other cases, *Stevens* and *Richardson v. Mo. Pac. R.R.*, 186 F.3d 1273, 1278 (10th Cir. 1999)). Accordingly, the trial court instructed the jury in relevant part:

> You may award damages for aggravation of an existing disease or physical defect or activation of any latent condition resulting, in whole or in part, from the occurrence in question. If you find that there was such an aggravation, you should determine, if you can, what portion of the plaintiff's condition resulted from the aggravation, and make allowance in your answer only for the aggravation.

UP argues that this charge correctly instructed the jury on the law, and we agree. It accurately states that law—i.e., that UP is liable for damages for aggravation of Haynes's pre-existing conditions and that the jury should, "if [it]

18

can," assess damages just for the damages caused by UP's negligence. The jury instruction thus also assisted the jury in making its damages determinations, and was supported by both the pleadings and the evidence demonstrating that Haynes had pre-existing conditions that he alleged were aggravated by his injury. *See* TEX. R. CIV. P. 278; *Williams*, 85 S.W.3d at 166.

Haynes, however, objected to this instruction and offered his own aggravation instruction:

> If you find for the Plaintiff, you should compensate him for any aggravation of an existing disease or physical defect resulting from such injury. If you find that there was an aggravation, you should determine, if you can, what portion of the Plaintiff's condition resulted from the aggravation, and make allowance in your verdict only for the aggravation. *However, if you cannot make that determination or if it cannot be said that the condition would have existed apart from the injury, you should consider and make allowance in your verdict for the entire condition.*

(Emphasis added).

Haynes's complaint on appeal focuses particularly on the trial court's refusal to add the last sentence of his proposed instruction—referred to by the parties as the "aggravation tail" or "apportionment tail"—to the jury charge in this case. He argues that it was necessary for the trial court to instruct the jury regarding what it should do in the absence of sufficient evidence to allow for apportionment. Haynes asserts that the instruction as given misinformed the jury regarding the burden of proof on the apportionment issue and "provided no guidance to the jury in terms of

19

which party should benefit from" the lack of evidence supporting the apportionment of damages between his pre-existing conditions and the aggravation of those conditions.

Haynes relies in part on *Stevens v. Bangor & Aroostook Railroad Co.* to support his arguments. In *Stevens*, the employee had been injured, through no fault of his own, when he slipped and fell while working for the railroad, hurting his back. 97 F.3d at 597. Post-injury treatment revealed that Stevens had "early degenerative disk disease and some narrowing of the disks." *Id.* Expert testimony indicated "that, while 'there must have been some degenerative disk disease present' before the accident, 'it was silent[,] [s]o [Stevens] did not feel anything,' and that the accident caused him to feel the condition for the first time." *Id.* at 601. In charging the jury, the trial court in *Stevens* had instructed, "If you cannot separate the pain or disability caused by the pre-existing condition from that caused by the occurrence of February 19, 1994, then the defendant is liable for all of plaintiff's injuries." *Id.* The railroad objected to this instruction, arguing that the instruction misstated the law. *Id.* The *Stevens* court, however, considered "which side should prevail on [the issue of apportioning damages for a pre-existing condition] in a FELA action when there is adequate expert testimony that an accident aggravated a pre-existing condition but the jury cannot separate the pain or disability caused by the pre-existing condition from that resulting from the

20

accident," and it ultimately held that the instruction correctly stated the law and that the trial court did not err in giving that instruction to the jury. *Id.*

Haynes argues that *Stevens* and other similar cases demonstrate that the "aggravation tail" instruction, such as the one given in *Stevens* and the one Haynes requested here, is required by federal law. But *Stevens* did not hold that courts must charge the jury on what to do "if [it] cannot separate the pain or disability caused by the pre-existing condition from that caused by the occurrence" in every case. Rather, *Stevens* held that the charge in that case was a correct statement of the law and that it provided helpful instruction to the jury to determine which should party should prevail "when the harm due to the pre-existing condition is inseparable from the harm due to the accident." *Id.* It does not necessarily follow that the same instruction would have been necessary, or even helpful, in this case.

We first observe that a trial court may refuse to give the jury a requested instruction when the instruction is not necessary to enable the jury to render a proper verdict, even if the instruction represents a correct statement of law. *See Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984) (holding that court should not burden jury with surplus instructions); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ) (holding that every correct statement of law does not belong in jury charge);

*Commitment of Ybarra*, No. 09-14-00394-CV, 2016 WL 637728, at *2 (Tex. App.—Beaumont Feb. 18, 2016, no pet.) (mem. op.).

Furthermore, the facts in *Stevens* are distinguishable from Haynes's in ways that materially affect whether the so-called "aggravation tail" was a necessary instruction. The evidence in *Stevens* was sufficient to raise the issue of pre-existing injury, but Stevens was unable to provide evidence of the exact nature of his pre-existing degenerative disk disease: his "treating physician testified that, while 'there must have been some degenerative disk disease present' before the accident, 'it was silent[,] [s]o he did not feel anything,' and that the accident caused him to feel the condition for the first time." 97 F.3d at 601. The court in *Stevens* was thus faced with a situation in which there was evidence of a pre-existing condition, but the evidence was such that the jury could not easily separate the pain or disability caused by the pre-existing condition from that resulting from the accident. *See id.*

Haynes, by contrast, presented clear evidence of the nature of his condition prior to his accident and the changes to his health. Haynes himself and Drs. Charnov and Kushwaha gave a clear history of both his pre- and post-accident condition. Haynes's doctors testified unequivocally that his pre-existing injury was aggravated, and Haynes testified that, after the accident, his pain increased, his radiating pain shifted from his right arm to his left, and his symptoms could no longer be improved by rest and the use of pain medication or injections. Drs.

Charnov and Kushwaha testified that the aggravation caused by the train accident contributed to Haynes's need for cervical spine surgery. Haynes also presented evidence of changes to his mental health that occurred after the accident. Union Pacific presented additional, albeit contradictory, evidence regarding Haynes's pre- and post-accident condition. Dr. Greider, UP's expert, testified that none of the injuries to Haynes's neck or left shoulder had been caused by the April 1, 2005 accident, and they were entirely pre-existing.

While the jury had to resolve the conflicts between the various experts that testified, nothing in the evidence suggested that Haynes's pre-existing condition was indistinguishable from his post-accident injuries. *See, e.g.*, *Sauer v. Burlington N. R.R. Co.*, 106 F.3d 1490, 1494 (10th Cir. 1996) ("When there is evidence that defendant's negligence aggravated a preexisting condition but expert testimony does not precisely apportion the injury, apportionment is an issue for the jury."). Haynes argues that the jury might have thought it could refuse to award any damages at all if it could not apportion between pre-existing and aggravated injury. But nothing in the record suggests that the jury faced this dilemma so that the requested instruction was necessary for the jury to render a proper verdict here. Nothing in the record supports an inference that Haynes's harm due to his pre-existing conditions was inseparable from the harm due to the accident. *See Stevens*, 97 F.3d at 601 (holding that general statement of law—that defendant was liable

23

only for additional increment of injury caused by its negligence and not for pain or impairment that plaintiff would have suffered from pre-existing injury—does not "provide a complete response to the question of which party prevails when the harm due to the pre-existing condition is inseparable from the harm due to the accident").

In light of these differences between *Stevens* and Haynes's case, we conclude that the requested additional instruction was not necessary. *See id.* We also observe that another Texas court has held, in the context of whether a railroad's proffered instruction was substantially correct so as to preserve its complaint of error in the charge, that a similar "caveat" to the one requested by Haynes here would "run afoul" of the prohibition against advising the jury of the effect of its answers to particular question. *Epple*, 2016 WL 7010581, at *3 (citing Rule of Civil Procedure 277, and *H.E. Butt Co. v. Bilotto*, 985 S.W.2d 22, 24 (Tex. 1998) for proposition that submissions that effectively instruct jury how to answer question for plaintiff or defendant to prevail is improper). The *Epple* court held:

> Telling a jury that if it could not apportion damages caused by pre-existing conditions from those caused by the negligence of BNSF [the railroad] then the railroad would be liable for all the damages is nothing short of telling the jury how to answer the question to secure the greatest relief for Epple. . . . That is more than an incidental way of informing the jury of the effect of its answer. It is actually telling the jurors how to answer the question to hold BNSF responsible for all the damages despite evidence illustrating that Epple would have suffered them notwithstanding BNSF's alleged negligence.

*Id.*

Here, the evidence clearly established that Haynes would have suffered from his pre-existing conditions even without UP's negligence. Including an instruction telling the jury that, "if it cannot be said the condition would have existed apart from the injury, [it] should consider and make allowance in [its] verdict for the entire condition" is not necessary and might have been confusing to the jury. *See id.* We likewise reject Haynes's assertion that including the extra language made the burden of proof more clear—nothing in the charge as given misrepresented the applicable burdens, and nothing in the requested instruction would have helped the jury to apply the burdens properly in this case. *See id.* Accordingly, we conclude that Haynes failed to demonstrate that the trial court abused its discretion in charging the jury.

We overrule Haynes's first issue.

## Bias and Cumulative Harm

In his second and third issues, Haynes asserts that the trial court was biased against him, resulting in reversible harm, and that, even if the specific instances of bias, standing alone, were insufficient to warrant a new trial, their cumulative effect deprived him of a fair trial.

## A. Standard of Review

"All parties have a right to a fair and impartial trial before a neutral judge." *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.). "One of the fundamental components of a fair trial is a neutral and detached judge." *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). Therefore, a judge should not act as an advocate for or adversary toward any party. *Id.* "To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party." *Metzger v. Sebek*, 892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

The trial court has great discretion in conducting the trial. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). To preserve a complaint that the trial court abused this broad discretion, a party generally must object to the trial court's alleged improper conduct or comment when it occurs, unless the conduct or comment cannot be rendered harmless by proper instruction. *Id.*; *Markowitz*, 118 S.W.3d at 87–88 (holding that party must object to judge's improper comment when it occurs and obtain ruling to preserve error for appellate review and rejecting complaint of bias where transcript of alleged comment was not made part of appellate record).

**B.    Analysis**

Haynes identifies several events to support his claim that the trial court demonstrated bias against him. Regarding three of the events—comments by the trial court during voir dire, comments by the trial court during Haynes's testimony, and a ruling by the trial court during closing arguments—Haynes failed to object on the record. *See Francis*, 46 S.W.3d at 241. The remaining events—comments by the trial court during the testimony of a witness and subsequent hearing on a motion for mistrial—do not rise to the level of reversible bias. *See Metzger*, 892 S.W.2d at 39.

*1.    Un-objected to comments and ruling*

<u>*Comment during voir dire*</u>

Haynes argues that the trial court "expressed irritation" about this Court's reversal of the first judgment during jury selection. Haynes, however, mischaracterizes the trial court's statements. During vior dire, a potential juror discussed a previous bad experience sitting on a jury for a lengthy contract case, stating that he "spent six weeks listening to testimony, and after the verdict was rendered, a week later the judge threw the verdict out." The potential juror stated that this left him with "negative opinions" that could bias him against one party or the other. The trial court then interjected:

> Let me say a word in defense of judges . . . and the Court of Appeals, too. Let me just tell you a little bit about how the system works. You

know, the decision I make in the course of this trial or any trial, I'm charged with following the law as I understand it. So sometimes I may have a different view of a case after I hear the same facts that the jury's heard . . . , and I might conclude that the law requires a certain result that maybe is not in line with the jury's findings; or in another situation I may make decisions that the Court of Appeals said, no, you made a mistake [judge] and you got to do this . . . again, you didn't charge the jury right, or you made an evidence ruling that was wrong. . . . [W]e do the best we can but we are not the final decider, that the Court of Appeals has a voice and then the Supreme Court has a voice, and, ultimately, they'll be the ones that decide what the law in a particular situation is or what decision is required. So, yes, it's frustrating for somebody who participates in a trial, if they feel like the judge took it away from them. Yes, it's frustrating for me when the Supreme Court says, no, you made a mistake and you're going to have to do it again, but it's part of our system that we have these kind of checks and balances so that somebody else will take a look at my work and the jury's work and ultimately make a decision in each case.

Haynes made no objection to these comments.

### *Comment during Haynes's testimony*

Haynes further identifies a statement the trial court made while UP was cross-examining him. UP's counsel was questioning Haynes regarding the circumstances surrounding the accident, asking why he would attempt to cross the tower crossing in his Honda sedan for the first time when "there were [train] cars that were coming that could not stop." Haynes stated that "[t]here wasn't any cars coming" when he tried to cross and that he "would not go across the track if a car is coming." UP asked several questions regarding why Haynes believed that the crossing was clear:

28

[counsel]: So what you're telling us is you thought the trains' humping had stopped and that's the only reason you went?

[Haynes]: When I pulled up to the tracks, the carman was in front of the car and I know he has to walk back to the back of the car, pull the cut lever, and walk with it about ten feet before he releases the car, and I left while he was in front of the car.

UP's counsel expressed confusion regarding Haynes's testimony and continued asking questions regarding what Haynes observed immediately before he attempted to cross the tracks. Haynes again repeated that, when he pulled up to the track, the pin puller or carman "had to walk to the north side and pull the cut lever then walk with [the car]; and then when you get to the let go point, let it go. I saw the pin puller and he walked back . . . [t]o get the next car, pull the cut lever."

UP asked again whether Haynes was aware that a train car was moving toward him when he attempted to cross the track, and then the following exchange occurred between Haynes's attorneys and the trial court:

[counsel]: Judge, the witness just testified that's not what happened and [UP's counsel] has tried to get him to admit that's what happened.

[Court]: Well, I don't know whether that's—I guess that's supposed to mean objection.

[counsel]: It was, Judge, I apologize.

[Court]: If it is, it's overruled. I don't want to spend all day on this. It sounds like, Mr. Haynes, you were trying to slip between cars. You know, there's one being cut loose and

29

you're trying to get between one that's been cut and the one that goes by and the next one that's coming. If you didn't stop them, there's this continual line coming, right?

[counsel]:   Can we approach, your Honor?

[Court]:   I'm trying to figure out what he's telling us.

[counsel]:   Can we approach, your Honor?

[Court]:   Do you have an objection?

[counsel]:   Can we approach?

A discussion was then held at the bench, off the record. The record does not contain any indication that Haynes objected to the nature of the trial court's comment or asked the trial court for an instruction to the jury regarding the trial court's comment.

*Ruling during closing arguments*

Finally, Haynes points to a ruling during closing statements as supporting his claim that the trial court was biased. During Haynes's rebuttal closing argument, the following exchange occurred:

[Haynes]:   The Railroad . . . didn't bring you the locomotive event recorder that could have fully and finally resolved the most important issue in this case.

[UP]:   I beg your pardon. That is improper evidence. There is no predicate for that.

[Court]:   The evidence was that nobody knew whether there was one on this locomotive at that time.

30

> [Haynes]:  I'll address what Mr. Pridgen's testimony was, Judge. Thank you. Mr. Pridgen said when they came in in 2003 and he got that training, they were trained every one of those locomotives had those event recorders. They would be pulled and they would show stop times. . . .

Haynes did not object to the trial court's statement at that time or otherwise address UP's objection.

Haynes now argues that these statements demonstrate the trial court's irritation with and bias against him, including that "the trial court plainly and unmistakably endorsed UP's version of events on a hotly-disputed and pivotal evidentiary issue." By failing to object to these statements or rulings, however, Haynes failed to preserve these complaints for review on appeal.

Haynes did not object to any of these comments or rulings on the basis that the trial court's conduct was improper. Indeed, regarding the trial court's comment during voir dire, it does not appear that the trial court referenced Haynes or his case at all. During closing argument, Haynes's counsel agreed to "address what Mr. Pridgen's testimony was" rather than object at the time. Haynes also failed to demonstrate that any comments or ruling could not have been rendered harmless by a proper instruction, such as an instruction to disregard. *See Francis*, 46 S.W.3d at 241; *Markowitz*, 118 S.W.3d at 87–88; *see also Ellason*, 162 S.W.3d at 887 (holding that "[i]t is only in the rarest circumstances . . . that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair

and impartial trial was not possible" and that "[r]ulings with which a party disagrees are best brought as grounds for appeal rather than evidence of judicial bias").

### 2. *Preserved Complaints of Bias*

<u>*Comment during Pridgen's testimony and motion for mistrial*</u>

Haynes argues that the "trial court again demonstrated its bias and hostility" during the testimony of Steven Pridgen. Pridgen testified regarding recording mechanisms on the trains. Pridgen testified that during humping, the cars could have an engineer or be controlled remotely, and when he was trained on the remote control system, he was informed that the remote control engines were being monitored or recorded "on an event recorder and they would know what speed you're going or whether you were stopped or going forwards, backwards, or any of that." Pridgen was not at the yard on the day Haynes was injured and did not testify regarding the specific train that injured Haynes. However, when he was asked whether someone could have "hit the stop button or created some kind of slack" in the train, he answered, "I would have thought through my training that they had that all documented in the event recorder. I mean, that would really clear everything[.]" Later, Haynes's attorney asked Pridgen, "If we had the event recorder, would we know whether there were unexpected stops or changes?" and Pridgen answered, "Absolutely."

During this testimony, while Pridgen was testifying regarding the delays that could ensue from a failure to maintain the designated schedule, the trial court sua sponte interjected, "Mr. Cohen [Haynes's counsel], Counsel, let me see you a minute." The parties engaged in a discussion at the bench, and no record was taken of this conversation. The record then continued with Haynes's counsel's examination of Pridgen. After Pridgen completed his testimony, and outside the presence of the jury, Haynes's counsel asked to "make a record of the side-bar that was held and possibly a [b]ill to preserve the record" regarding "to what extent the Court's comments at the side-bar were loud enough for the jury to hear." Haynes's counsel asserted:

[counsel]:    My paralegal, Ashley, told me—she wrote before I got back that she could hear the Court say, "This is a scheme," and that "we"—meaning Your Honor's talking to me saying, "You are trying to get UP to pay for what is the Plaintiff's fault." She wrote that. She could hear that.

[court]:    But she's not sitting under the—under the white noise.

[counsel]:    And the moment the Court finished saying that, several jurors giggled and she wrote down their names and a description of them. Judge, if any of those jurors heard that, they only have two choices they can make. They can believe that Your Honor is right and think that we are engaged in a deceptive scheme and that our case is frivolous or they can wonder why Your Honor is saying those things about a case they believe in, but I tend to think the trappings of the Court come with a lot of force in the juror's mind, and I am deeply concerned.

33

Haynes sought a mistrial on this basis. UP's attorney objected, asserting:

> I think he's, first of all, misquoting and the record will speak for itself. Secondly, as the Court points out, the speakers that make the white noise are right over the jury. We're not in the same place, and I think he's misquoting the record as far as what was said. So, A, I don't think there's any evidence a jury would have heard it, and, B, I don't think that's an accurate description of what was said out of context, and it's no basis for a mistrial. It's speculation.

The trial court then stated:

> I really want to grant a mistrial, and you will never see me again, and you'll never get another setting from me while I'm in this court. Understand that? So you're looking at two things. I'll stay until the end of my term and you're looking at 2019. This case is being tried on innuendo, suspicion, what could have happened. We've got witnesses that haven't been out to the yard in 20 years saying what they remember, they think about, you know, what happened 20 years ago, maybe, or what could have happened 20 years ago; and you wonder why I'm curious about this case.
>
> Mr. Cohen, you're good at making a mountain out of a mole hill, I'll give you credit for that. That's my judgment based on having listened to the evidence in this case twice; and when things don't go your way, then we move for a mistrial or we make a *Batson* Motion or we do something else to try to get another start.
>
> It's my belief that the jury, because I turned the white noise on before you ever came up here, didn't hear a thing I said to you all. You're just looking for a third bite at the apple because it's a weak case. You've got somebody who didn't even ask that the train be stopped, so we don't know what would have happened had he asked, who won $500,000 in judgment the first time around is greedy coming back for a second go around, and now you want a mistrial. I'm just astounded at the nerve of you and your client in this case, frankly. Without having—your client didn't ask that the train be stopped so we don't know what would have happened, but he plows ahead and gets run over, unfortunately, and now he wants the Union Pacific and all its customers in effect to pay for his decision to drive his car over a rickety crossing in front of a train. The case is thin to start with, but I've given you a fair trial. I'm giving you a fair trial again, and now

you don't like the way it's going so you want to start over. I'm almost inclined to let you after I'm gone.

The trial court denied the motion for mistrial, but it allowed Haynes to make a record regarding what had occurred during the bench conference. The paralegal for Haynes's trial team testified that she heard portions of the bench conference from plaintiff's counsel's table, which was closest to the juror box but still approximately five to ten feet away from the nearest juror. The paralegal testified she could also hear the white noise from her seat and that it was "annoying, annoyingly loud." She testified that she heard the trial court and made notes about what she heard, which she read into the record as stating, "'this is a scheme, slash, scam and we are trying to get UP'—Union Pacific—'to pay for what is Richard's fault. Several jury members giggled.'" And she described the jurors who she observed giggling.

Co-counsel for Haynes also testified regarding the bench conference. He testified that he was at the bench when the trial court made its objectionable comments. Co-counsel testified that, initially "the Court had his voice down, had his mouth covered and there was a discussion about the testimony of the witness" but as the discussion continued, "the Court removed his hand from his mouth and became more and more animated and more and more loud and physically angry." Regarding the substance of the bench conference, co-counsel agreed with the paralegal that the trial court said, "[Y]ou want 'us to pay for the Plaintiff's

35

mistake.'" Co-counsel was concerned that the comments made during the bench conference had adversely affected Haynes's entitlement to a fair trial and thought the motion for mistrial was appropriate.

Counsel for UP then sought to add to the record, and stated:

I believe the side-bar was prompted by a line of questions that were to the effect of due to: "Does the humping motion stop at times and other times it doesn't stop? Yes. But is the norm not to stop," that line of questions is trying to infer the jury and have them speculate about something that didn't happen; and it is speculation because the Plaintiff himself says he never asked him to stop, and that's undisputed; and I believe when we approached for the side-bar, the Court asked Counsel, did Mr. Haynes ask that the movement stop, and Counsel said, no, he didn't, so isn't this a waste of time, I do believe I heard the Court say.

The white noise or whatever, I remember earlier in the trial when you were playing it, the jury really reacted and even, I think, giggled because it was annoying and loud for them. I remember there was a discussion the Court had with the jury that, I'm sorry about this white noise but that's how we keep you from hearing things. I believe it was yesterday. That I also have seen how loud it is because the speakers are right there over the jury; and whether a jury is giggling, I mean, I've seen juries giggle at about every other bench conference I've been at because whatever they've got going, whatever they think, it does not necessarily or in any way require a finding that it was because of something the Court had said. Jurors giggle a lot during breaks and I think they giggled yesterday about that white noise. I just wanted to add that for the record, too, Judge.

Another attorney for UP stated,

I don't have a word-for-word recollection, but I do not recall anything about a scheme to compel The Railroad or anyone else to pay the verdict. What I recall the gist of the conversation was, was maybe your frustration about, maybe, some repetitive and irrelevant questioning and what not and you wanted to move the trial along.

36

Finally, the trial court also stated,

> [M]y recollection is more like [UP's counsel's] at this point. You were, in my judgment, trying to mislead the jury. Your question to the witness suggested—was suggesting that if a request to stop the train had been made it would have been disregarded by the tower conductor or other persons in charge of the train. At that point, since I was concerned that that was a hypothetical entirely, I brought you up and asked whether your client had, and which was the reason for the bench conference. I asked you whether your client had asked that the humping train be stopped or was there evidence that the humping train be stopped; and you said, no, there was not, that he had not asked for that; and at that point, I told you to discontinue questions about what might have happened had he asked since he did not.
>
> Pure speculation, but you are trying to imply to the jury that they wouldn't have stopped the train for him with a witness that wasn't even out there that day.
>
> Now, we try cases on facts here not what might have happened or what someone might have done had a request been made. He did testify before that people—he had seen trains stopped when somebody asked for that, and that's why I was concerned about your question.
>
> Now, as far as what the jury heard, [UP's counsel] is correct, they often laugh when the white noise is turned on. I don't know what to read into that. I'm not going to stop this trial.

The trial court denied the mistrial but stated that he would reconsider it at the end of the case. The trial court also offered to "instruct the jury that if they overheard anything while we were up here talking to disregard it, that they're the judge of the facts and, you know, my reaction to anything, they should disregard it[.]" Haynes's counsel informed the trial court he would think about it and then let the court know what they wanted to do. It does not appear that any curative instruction was given at the time testimony started again. Nor does it appear that Haynes ever attempted to ask any of the jurors, either at the time of the bench

37

conference or at the end of the trial, whether they heard anything during that conference.

We first observe that this record is unclear regarding what comments the judge made during the bench conference and what comments, if any, members of the jury heard. Accounts of the substance of the comments and their audibility were contradictory. Accordingly, we conclude that Haynes has failed to bring forward a record clearly showing what comments, if any, the jury heard. *See, e.g.*, *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 636 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding that appellant bears burden to bring forward on appeal sufficient record to show error committed by trial court and that appellant's failure to obtain reporter's record containing challenged ruling made it impossible for appellate court to determine that trial court had erred).

We next observe that, while comments the trial court made on the record indicated the trial court's frustration, impatience, and even skepticism regarding the ultimate merit of Haynes's claims, such statements do not support a finding of bias here. "[O]pinions the judge forms during a trial do not necessitate recusal 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Francis*, 46 S.W.3d at 240. Furthermore, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality

38

challenge." *Id.* (citing *Liteky v. U.S.*, 510 U.S. 540, 555 (1994)). Expressions of "impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality. *Id.* The trial court's comments during the hearing on the motion for new trial, which was conducted outside the presence of the jury, conveyed criticism and disapproval of Haynes's claims and his counsel's strategy and trial tactics, but it did not display "deep-seated favoritism or antagonism that would make fair judgment impossible." *See id.*

### 3.      *Cummulative harm*

Haynes argues that these instances demonstrated the trial court's bias against and hostility toward Haynes, his case, and his counsel and that the bias caused unfair prejudice to Haynes, warranting a new trial on all issues. And he argues that, even if the specific instances of bias, standing alone, were insufficient to warrant a new trial, their cumulative effect deprived him of a fair trial.

Multiple errors, even if considered harmless when taken separately, may result in reversal if the cumulative effect of the errors is harmful. *Haskett v. Butts*, 83 S.W.3d 213, 221 (Tex. App.—Waco 2002, pet. denied); *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998). However, we found no errors regarding Haynes's preserved complaints of bias, and, therefore, we need not undertake a

cumulative-harm analysis. *See* TEX. R. APP. P. 44.1(a), 47.1; *Haskett*, 83 S.W.3d at 221.

We overrule Haynes's second and third issues.

**Offset**

In its second cross-issue, UP asserts that it is entitled to an offset for its payment of railroad retirement taxes. In his reply brief, Haynes recognized that, in the interim between the trial court's ruling on this issue and this appeal, the U.S. Supreme Court has settled this issue and ruled that past wage loss awards are taxable. *See BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 899–900 (2019). Haynes asserted, "In the event the Court rules against [Haynes] on his appeal, and rules against UP on its other cross-appeal issues," as we have done, Haynes "does not oppose UP's cross-appeal request for modification of the judgment to allow deduction for" taxes on the past lost-wages award.

We sustain UP's request that we modify the judgment to reduce the lost-wages award by $14,648.40 as an offset to account for the taxes paid.

## Conclusion

We modify the judgment of the trial court by reducing the past lost-wages award by $14,649.40, and we affirm the judgment as modified.


Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.